Mr, Chief Justice Marshall
 

 delivered the opinion of the. Court.
 

 This is a writ of error to a judgment rendered by the supreme court of Ohio for the county , of Champaign, in an ejectment in which the lessee of-D.uncan M’Arthur was plaintiff, and John Reynolds was defendant. The plaintiff claimed the land in controversy, under a patent issued on. the 12th day of October 1812, founded on an entry made in the year 1810, on a military land warrant granted by the state of Virginia for services during the war of the revolution, in the Virginia line, on continental establishment.
 

 
 *424
 
 The title of the defendant is thus stated. The land was sold by the United States at their land office in Cincinnati, in the year 1805, to Henry Van Meter. It reverted to the United States-in the year 1813 on account of the non-payment of the purchase money; and was again sold, during the same year at the same office, to Henry Van Meter, to whom a certificate of sale was issued, which he afterwards transferred to the defendant John Reynolds.
 

 The verdict and judgment were in favour ot tne plaintiff in the state court. At the trial, the counsel for the defendant moved the court to instruct the jury on several points made in the cause, arid excepted to the refusal of the court, to give these instructions. The judgment of the state court, having been against a title set up under several acts of congress, is brought before this Court by writ of error, that the construction put on those acts by that court may be re-examined. The inquiry will be, whether the court ought to have given any one of the instructions which were lequired. The several prayers for this purpose will be considered in the order in which they were made,
 

 1. The first instruction asked is, that the-lands west bf Ludlow’s line, east of Roberts’s line, and south of the Indian boundary line, had been withdrawn from appropriation under and by virtue of 'military land warrants prior to the year 1810; and that as the same had, pursuant to the acts of congress in such case made and provided, been directed to be surveyed and sold, and had accordingly been surveyed and sold to the defendant, prior to the year 1810; the plaintiff’s patent is void, and their verdict ought to be for the defendant.
 

 This motion does not- question the bounds bf the lands reserved.by Virginia for military bounties, but supposing the tract of country-west of Ludlow’s line, east of Roberts’s line, and south of the Indian boundary line to be within that reserve, asks the court to sáy, that congress had, prior to the year 1810, when M’Arthur’s entry was made, withdrawn it from appropriation under and by virtue of military land warrants.
 

 
 *425
 
 Before deciding on the - propriety of refusing or granting this, prayer, it will be necessary to review the legislation of congress on this subject.
 

 The actofthe 9th of June 1794
 
 (a)
 
 , taken in connection with the reservation in favour of their officers and soldiers contained in-the deed of cession made by Virginia, unquestionably subjected the whole of ihe military reserve to the satisfaction of those warrants, for which the reserve was made. Had congress, previous to the year 1810, withdrawn that portion of this reserve which lies between the line run by Ludlow, and that run by Roberts, from its liability to be so appropriated
 
 Í
 

 So early as the year 1785, congress passed “ an ordinance
 
 (b)
 
 for ascertaining the mode of disposing of lands in ihe western territory,” in which, for the purpose of securing to the officers and soldiers of the Virginia , line on continental establishment, the bounties granted them by that state, it is oydained “ that no part of the land between the rivers called Little Miami arid Scioto, on the north west side of the river Ohio, be sold or in any manner alienated, until there shall first have been laid
 
 off
 
 and appropriated for the said officers and soldiers and persons claiming unde' ‘hem, the lands they are entitled to agreeably to the said deed of cession and act of congress accepting the same.”
 

 The scrupulous regard which this clause, in the ordinance of May 1785, manifests to this?condition made by Virginia in her deed of cession, is the more worthy of remark,' because at that time no suspicion was entertained that the military warrants of Virginia would, cover, the whole territory ; and it was even doubted, as the legislation of congress shows, whether any part of that territory would be required for them. Even under these circumstances, congress declared the determination not to sell or alienate any land Detween the Scioto and the Little Miami.
 

 . In May 1796 congress passed “ an act providing for the sale of the lands of the United States in the territory north
 
 *426
 
 west of the river Ohio and above the mouth of Kentucky river
 
 (a)
 
 .”
 

 The second section enacts that, “ the part of the' said land which has not been already conveyed,” &c; “ or which has not been heretofore, and during the present session of congress may not be appropriated for satisfying military land bounties, and for other purpose?, shall be divided,” &e.
 

 This law then, from which the whole power of the surveyor general is derived, excludes from his general authority all lands previously appropriated for military land bounties and for other purposes; and consequently excludes from it the. lands between the Scioto and the Little Miami.
 

 In May 1800
 
 (b)
 
 , congress passed an act to amend the act of 1796, which enacts “that for the disposal. of the lands of the United States directed to be sold by the original act, there shall be four land offices established in the said territory.” The places at which these land offices, shall be fixed are designated in the. act, and the district of country attached to each is described. One of these is Cincinnati, the place at which' the lands in controversy were sold, and the district attached to it is that below the Little Miami.
 

 It is perfectly.clear from the language of this act, that it extends to those lands only which were comprehended in the act of May 1796, and that-no one of the districts established by it, comprehends the land in-Controversy. Any general phrases which may be found in the law must, according to every rule of construction, be limited in their application to those lands which the original act authorized the surveyor general to lay off for the purpose of being sold. If he surveyed any lands to which that act does not extend, he exceeded his authority, and the survey is not sanctioned by the law. If land thus surveyed by mistake has been sold, the sale was not authorized by the law under colour of which it was made.
 

 The counsel for the plaintiff in error has pressed earnestly on the Court the grants made to John Cleves Symmes, and
 
 *427
 
 to the purchasers.under him. We are not sure that the argument on this point has been cleárly understood, and have therefore examined that transaction, in order to discover its influence, if it can have any, on the question now under consideration.
 

 In 1787 John Cleves Symmes applied to congress for a grant to himself and his associates of the lands lying within, the following limits, viz. “ béginning at the mouth of the Great Miami river, thence running up the Ohio to the mouth of the Little Miami river, up the main stream of the Little Miami river to the place where a due west line, to be continued from the western termination of the northern boundary line of the grant to Messrs Sargent, Cutler & Co. shall intersect the said Little Miam’feriver, thence due west, continuing the said western line to the place where the said line shall intersect the main branch or stream of the Great Miami, thence down the Gréat Miami to the place of beginning.”
 

 In consequence of this petition, a contract was entered into for the sale of one million of acres of land to begin, on the bank of the Ohio, twenty miles along its meanders above the mouth of the Great Miámi, thence to the mouth of the Great Miami, thence up that river to a place whence a line drawn due east will intersect a line drawn from the place of beginning, parallel with the general course of the Great Miami, so as to include one million of acres within these lines and the said rivers, and from that place upon the said Great Miami rivér, extending along such lines to the place of beginning, -containing as aforesaid one million of acres.
 

 The. language of this contract does not indicate anjj’ intention on the part of congress to encroach on the military reserve, which the ordinance of May 17.85, then in full force, had excepted from sale or alienation.
 

 In 1792
 
 (a)
 
 , congress, at the request of John C. Symmes, passed an act to alter this contract, in such manner that the land-sold should extend from the mouth of the Great Miami to the mouth of the Little Miami, and be bounded by the
 
 *428
 
 river Ohio On the south, b,y the Great Miami ok the west, by the Little Miami on the east, and by a parallel of latitude on the north, extending from the Great Miami to the Little Miami, so as to comprehend the proposed quantity of one million of acres.”
 

 The lands then whi'chfmight be granted to JohnC. Symmes, in pursuance of this act of congress, lay between the Great and Little Miami, and were to lié below the Little Miami. The Scioto is. above that
 
 river;
 
 so that congress could not have intended that this grant to Symmes should interfere with the military reserve.
 

 On the 36th of September, in the year 1794, a deed was executed in pursuance of the act of 1792, conveying to John C. Symmes that tract of lánd beginning at the mouth of the' Great Miami river, and extending from thence along the river Ohio to the mouth of the Little M:ami rivfer, bounded on the south by the river Ohio, on the nest by the Great Miami, on the east by the Little Miami, and on the north by a parallel of latitude to be run from the Great Miami to the Little Miami, so as to comprehend the quantity of 3LI,682. acres of land.
 

 It is obvious that this patent does not interfere with the military reserve. But John C. Symmes had sold to several persons who purchased in the confidence that he would comply with his contract., for one million of acres, and be enabled to convey the lands sold to them.
 

 In March 1799 congress passed an act declaring that any person or persons, who, before the first day of April in the year 1797, had made any contract in writing with John C. Symmes for the purchase - of lands between the Great and Little Miami rivers, which aré not comprehended in Ihis patent dated the 30th of September 1794, shall be entitled to a preference in purchasing of the United States all the lands so contracted for at the price of two dollars per acre.
 

 In March 1801, congress passed an act extending this right of pre-emption to all persons who had, previous to thb first day of January 1800, made any contract in writing with the said John C. Symmes or with any of his associates, for the purchase of lands between the Miami rivers, within the
 
 *429
 
 limits of . a survey made by Israel Ludlow, in conformity to an act of congress of the 12th of April 1792.
 

 The provisions of . this act are supposed to contemplate the survey and salé of the lands which had been sold to John C.' Symmes between the Miami rivers; in like manner as had' been prescribed for other lands lying above the mouth of Kentucky by the acts of 1796 and 1800. The right of preemption was limited to lands within Israel Ludlow’s survey; but that survey contained less than 600,000 acres,'and the contract of Symmes was for oné million of acres; congress therefore resumed the .consideration 'of this subject, and in May 1802 extended this right of pre-emption to all those who had purchased from John C. Symmes, lands lying between the Miami rivers," and without the limits of Ludlow’s survey. It cannot be doubted that this right of pre-emption allowed to the purchasers under John C. Symmes, was limited to lands lying between the Miami rivers and lying within his contract. Congress could never have intended that this* contract should interfere with the .military reserve. That réserve was of lands lying above the Little Miami." The sale to Symmes was of lands lying below that river. It was made while an ordinance was in full force, declaring the resolution of congress not to alienate any part of that reserve. Their contract was made in subordination to that ordinance, and cannot have intended to,violate it. The terms of the contract do not purport to violate it. The land sold to Symmes, and the pre-etnptioii rights allowed to the purchasers under him, are so described as to furnish no ground for the opinion that congress could have suspected them to interfere with the military reservé. If the Scioto and the Great Miami, contrary to all probability, should take such a direction as to produce a possible" interference bétween the lands sold to Symmes and the reserve which congress had declared its resolution not to alienate, some difficulty might, possibly arise in a case where one of the parties claimed under a military warrant, and the other under a pre-emption certificate. But that is not this case. The title of the ’ plaiutiff in error is under a purchase made at á sale of the lands of the United States at Cincinnati, by Henry Van Meter, who is
 
 *430
 
 hot. stated to have held a pre-emption certificate,.or to have been a purchaser under Symmes.
 

 The instruction, which the court was asked to give is, that the. land between the lines of Ludlow and Roberts had been withdrawn, from appropriation, under and by virtue of military land warrants, previous to the year 181Q. This withdrawal is not in express terms, but is supposed to be implied from a direction to survey, the lands between the Great and Little Miami which had been exempted from the operation of the acts of 1.796 arid 1800, under the idea that they were comprehended in the contract with Symmes. Congress could not suspect that the lands to be surveyed under this, law could interfere with the lands lying between the Little Miami and the Scioto; and consequently, cannot have intended by this act to vary the boundary, of the military reserve.
 

 It has been very truly observed, that all the laws on this subject should be taken together. The condition inserted in the deed of cession of Virginia, which reserves the land lying between the little Miami and thé Scioto, for, the purpose of satisfying the warrants granted to t,he officers and soldiers of that state; the ordinance of May 1785, declaring that no part of that reserve should be alienated; the contract with Symmes for the sale of lands lying between the two Miami; the acts relative to pre-emptions, and which direct the survey and sale of the lands, lying between the Miami; without any. ¿Ilusión to the military district; must be' taken into view at the same time.
 

 It is, we think, impossible to believe, that congress supposed itself, when directing the survey and sale of lands between the Great and Little Miami, to be abridging;or altering the bounds of a district which Virginia had reserved in the deed of cession by .which the country north west of the Ohio had been conveyed to the United States.
 

 When congress designed to act on this. subject, the purpose was expressed'; and overtures were made to the other party to the compact, to obtain her co-operation.
 

 In executing the act of May 1800, the surveyor general had caused á line to be run, from what , he supposed to be
 
 *431
 
 the source of the Little Miami, towards what he supposed to be the source of the Scioto, which is the liqe denominated Ludlow’s, and surveyed the lands west of that line in the manner prescribed by the act of congress.
 

 In March 1804
 
 (a)
 
 , congress passed an act establishing that line as' the western boundary of the reserve, provided the state of Virginia should, within two years after the passage oí the act, accede to it. . Virginia did not accede to it.
 

 In 1812
 
 (b)
 
 , congress made another effort to establish this line. The president was authorised to appoint commissioners to meet others which should be appointed by Virginia, who were to agree on the western line of the military reserve, and cause the same to be surveyed and marked out. These commissioners met; and after ascertaining the sources of the two rivers, employed Mr Chárles Roberts to survey and mark a line from the source of the one to the source of the other. This line is called Roberts’s line; The Virginia commissioners, however, refused to accede to this line.
 

 This act provided, that until an agreement should take place between the commissioners, the line designated in the act of 1804, which is-.Ludlow’s, should be considered and held as the proper, boundary line. This enactment is provisional and prospective.
 

 In 1816
 
 (c)
 
 , congress'passed án act declaring'that from the source of the Little Miami to the Indian boundary line, established by the treaty of Greenville, Ludlow’s line should • be Considered as the western boundary of. the military reserve, until otherwise directed by law ; and that from the said Indian boundary line to the source of the Scioto river, the line run by Charles Roberts shall be so considered.
 

 When we review the whole legislation of congress-on this subject, we think the conclusion inevitable, that in the acts of-1801 and 1802, which have been cited, the legislature did not consider itself as altering the bounds of the military district, or as withdrawing before the year 1820-any part of the territory lying between the Little Miami and the Scioto
 
 *432
 
 from.being appropriated by the military land warrants granted. by the state of Virginia. If those acts have this effect, it is one which was not intended.
 

 Before a court can be required tp declare the law which would arise between conflicting statutes of this character, the fact that they do conflict, ought to be clearly established. The counsel for the plaintiff in error has argued this part of the case as if the fact was established ; as if a line drawn from the source of the Little Miami to the source of the Great Miami would include the land between Ludlow’s line and that of Roberts ; and this Court has thus far treated the question as it has been argued. But this,fact is not established in. this case. It is not among the facts agreed by the parties, nor was the 'stpte court required tp instruct the jury, that if they should find the land wést of Ludlow’s, and east of Roberts’s line to lie between the Little and Great Miami, or within Symmes’s purchase, “ that it had been withdrawn from appropriation, under and by virtue of said military land warrants, prior to the year 1810,” and that M’Arthur-’s patent was consequently void. The court was not required to state the law hypothetically, as being dependant on the fact ;.but to assume the fact, ¡and to state the law positively upon that assumption. The record, we think, did' not authorise the court to consider this fact as established, and to withdraw it from thé jury.
 

 There is no error in refusing this instruction.
 

 2. The counsel for the defendant then asked the court to instruct the jury, that, as the third section of the act of the congress of the United States, of the 11th of April 1818, declares : “ That from the source of the- Little Miami river to the Indian boundary line, established by the treaty of Green-ville in 1795, the line designated as the westerly boundary line of the Virginia tract, by an act of congress passed on the 23d day oí March 1804, entitled ‘ an act to ascertain the boundary of the lands reserved by the state of Virginia, north west of the river Ohio, for. the satisfaction of her officers and soldiers on continental establishment, and to limit the period for locating the said lands’, shall be considered and held as such until otherwise directed by lawand as said
 
 *433
 
 boundary line was run by Ludlow, under the directions of the surveyor general, pursuant to an act of congress, entitled
 
 tf
 
 An act to extend and continue in force the provisions of an act entitled * an act giving a right of pre-emption to certain persons who have contracted with John Cleves Symmes, or his associates, for lands lying between the Miami rivers, in the territory north west of the Ohio, and for other purposes,? ” approved May 1st, 1802; and offered for sale at public .auction, at the Cincinnati land office, pursuant to the 'act, entitled “ An act making .provision for the disposal of public, lands in the Indiana territory, and for other purposes,” approved March 26th, 1804, must be construed as having relation back to the time the above recited act, entitled
 
 (t
 
 An act to ascertain the boundary of the lands reserved by the state of Virginia, north west of the river Ohio, for the satisfaction of the officers and soldiers dn continental establishment, and to limit the period for locating said lands,” approved 23d of March 1804; was passed, and took effect; and as thé plaintiff’s patent covers lands west of that line, and south'of the Greenville treaty line, and is based on an entry made in 1810, on a.Virginia continental land warrant, which , land had. been'surveyed and sold to the defendant, pursuant to the acts of congress prior to the. year 1810, the plaintiff’s patent is void : and their, verdict ought to be for the defendant:
 

 The prayer for this instruction is founded on the assertion that Ludlow’s line was run under the direction of the surveyor, general, pursuant to the act of congress of the 1st of May 1802, granting pre-emption rights to purchasers from John Cleves Symmes; and that the land in controversy was. sold, pursuant to the act of the 26th of March 1804, making provision for the disposal of public lands in the Indian territory, and for other purposes.
 

 If by the words “ pursuant to an act of congress,” as used in this.prayer, it is intended to say that the boundary line rim by Ludlow’ was correctly run as required by the act of May "1st, 1802; and that the sale of the land in controversy was authorized by the act of the 26th of March 1804, then the court is required to decide facts not admitted by the parties,.
 
 *434
 
 which are proper for the consideration of the jury; and then to declare the law arising upon those facts. If those words mean no more than .that the line was actually run, under the authority of the surveyor general, and that the-land in controversy w.as actually sold at-the land office in Cincinnati by the officers of government, the question fairly arises, what influence have these facts on the rights o'f the parties? Do they, taken in connexion with the acts of the 23d of March 1804 and of the 11th of April 1818., justify the inference which the court is asked to draw,'that th§ act of 1818 relates back to the act of 1804, and takes effect from itS'date, so as to avoid a patent issued in October 1812, on an entry and survey made in 1810.
 

 It has already been stated that the act of the 23d of March 1804 establishes Ludlow’s line, not absolutely, but on condition that Virginia should assent to it; and that Virginia never did assent to it.
 

 It has alsó been stated that in 1812, congress authorized the'president to appoint commissioners who should proceed in concert with such as might be appointed by Virginia, to run a line which should constitute the.western boundary of the Virginia military reserve. These commissioners did meet, and did cause a line to run from the source, of the Little Miami to the source of the Scioto. This is called Roberts’s line. The commissioners of Virginia did not assent to this line. Consequently it is of no operation.
 

 The act of April the 11 th, 1818, declares that Ludlow’s line shall be considered and held as the true western boundary of the Virginia military reserve until otherwise directed by law. But from what time shall it be so considered and held ? The language of the law is entirely prospective. It is a principle which.has always been held sacred in the United States', that laws by which human action is to be regulated; look forwards, not backwards; and are never to be construed retrospectively unless the language of the act shall render such construction indispensable. No words are found in the act of 1818 which render this odious construction indispensable. The language is that Ludlow’s line
 
 shaty
 
 be considered and held, that' is, shall in future be considered and held as the
 
 *435
 
 true western boundary of that reserve. That this was the understanding of the legislature,'is rendered the more probable from the clause which relates to patents. It does not annul patents, already issued, but declares that no patent shall be granted on any location and survey that has. been or may be made west of this line. Patents which have been granted, are not affected directly by the words of-this law, and must depend on the pre-existing act of congress..
 

 The argument is, that this act declaring that Ludlow’s, line shall be considered and held as the westerly boundary line of the reserve until otherwise, directed by law, proves that,. according to the true construction of the deed of cession, this line is in reality the true boundary, and therefore that all titles previously acquired to lands lying west of this line are invalid.
 

 We cannot admit the correctness of this argument.
 

 That in the state of things which existed in
 
 1812
 
 and 1818, congress might establish the western boundary of the military reserve, so as to affect titles thereafter, tó be acquired, is Hot questioned. Congress might fix a reasonable time within which titles should be asserted, and might; annex conditions, to. the extension of this time. But to look back to titles alreády acquired, to declare by,a law what was the meaning of the compact under which those titles were acquired, is to construe that compact and to adjudicate in the form of legislation. It would be the exercise of a judicial,-, not of a Legislative power. This construction can never be admitted by the Court unless it be rendered indispensable by the language of .the act; We do not think that the lan*' guage of this act does require it.
 

 If the language of the statute does not require this construction, neither do the facts that Ludlow’s line was run by order of the surveyor general, and that the land in controversy was sold by the regular agents of government. These facts cannot we think carry back the act, of 18L8 to 1804, "and give it a retrospective operation.
 

 We. do not inquire into the power of congress to pass su,ch an act. There is undoubtedly much forcé in the argument suggested at the bar, that the general power of légis-
 
 *436
 
 latioñ, which congress could exercise over the territory north west of the Ohio, passed to the new governmént when the territory was erected into a state; and that congress retained only the power of a proprietor with á capacity “ to dispose of and make all needful rules and regulations respecting the property.” But it is unnecessary to pursue this inquiry, because we are of opinion that this construction is inadmissible.
 

 The Court therefore did right in rejecting this prayer.
 

 The third instruction asked by the defendant is in these xVords; that according to the true intent and meaning of the act and deed of cession from Virginia to the United States, the land lying between the rivers Scioto and Little Miami, is bounded, by a line extending from the source or point of. land farthest removed from the mouths of these rivers, from which the rain descending on the earth runs down into thejr respective channels, along the tops of the ridges, dividing the waters of the Scioto from the waters of the Great Miami, which empties into the Ohio below the mouth.of the Little Miami, as delineated on the diagram returned by the county surveyor for the defendant in this case; and as the pláintiff’s patent covers land west or without the boundary of the district so bounded as aforesaid, and is based on an •entry on a Virginia continental land warrant, which entry was made in the year 1810, and which said entry and patent cover land which had, pursuant to the acts of congress, been surveyed and sold to the defendant prior to the date of the plaintiff’s said entry, the plaintiff’s patent is void: and their verdict ought to be for the defendant-
 

 In the case of Doddridge
 
 vs.
 
 Thompson, 9
 
 Wheaton,
 
 469, this Court said that the territory lying between two rivers is the whole country from their sources to their mouths; and a straight line drawn from the source of one river to the source of the other was considered, in that case, as furnishing the western boundary of the lands lying betweén therm One or both of the rivers may pursue such-a course, that a straight line from the source of one to the source of the other may cross one, or both of them.. Such a case may form an exception to the universal , application'of the straight line,
 
 *437
 
 and may go far in showing that no general rule can be laid down which will fit every possible case. But this obvious and reasonable rule has .been adopted by congress as well as by this Court. .The act of 1804 adopts the straight line. The act of 1812. obviously contemplates a straight line, and the act of 1818 adopts Ludlow’s line, from' the source of the Little Miami to the Indian boundary line established at the treaty of Greenville,.and the line run by Roberts from the Indian boundary to the source of the Scioto.
 

 The counsel for the defendant in the state court abandoned the rule adopted by congress and by this Court, by taking for his commencement “that point of .land which is fárthest removed from the mouths of the respective rivers, and from which the rain descending on the earth runs down into their respective channelsand to draw, a line from that point along the top of the ridges dividing the waters of the Scioto from the waters of the Great Miami.
 

 We feel some difficulty in comprehending the principle which has suggested and can sustain this rule. Why should a line drawn along the top of the ridges which divide the waters of the Scioto from those of the Great Miami,-constitute the true boundary of the country lying between the Great and Little Miami ? Would such a line certainly lead tó the source mf the Scioto or to that-of the Little Miami ? We can give no satisfactory answer to these inquiries. It is some objection too to this instruction, that the jury would be much and unnecessarily perplexed in finding the point of land farthest removed from the mouth of each river,, and from which the rain descending op the earth runs down into their respective channels. If any point exists which vyould fit all parts of the description, and could be found by the jury, it is by no means certain that such point would be in a line which would mark the boundary of the country between the two rivers.
 

 The rule which the court was asked to lay down appears to us to be entirely arbitrary; and this prayer was properly rejected.
 

 4- The fourth instruction has been abandoned by the plaintiff in error.
 

 
 *438
 
 5. The proposition on. which the fifth prayer depends, is that the sources of the two rivers must be at that point in their respective channels at which, from the union of several streams, sufficient water flows, at an ordinary stage or which to navigate small vessels laden.”
 

 This rule for ascertaining the source of a river is entirely new in this country.
 
 A
 
 stream may acquire the name of a river which is not navigable in any part. A- river which is navigable, may retain that name above the highest navigable point. The meaning of words as commonly used must be changed before the source of a river can be confounded with its highest navigable point.
 

 The Court did not err in rejecting this prayer.
 

 6. The proposition on which the sixth prayer depends is, “ that the sources, of the two rivers must be considered as commencing at that point in their respective channels from which the water flows at all seasons of the year.”
 

 Is this proposition so invariably true as to become a prifi-ciple of law
 
 t
 
 We think it is not. Á stream may-acquire the name of a river, in the .channel of which, at somesear sons of extreme drought, no water, flows. For a great.portion of the year parts of a stream may flow* in great abundance,in which, during a very dry season, we may'find only standing pools. , It would be against all. usage to say that the general source of the river was at that point in jts channel from which the water always flows.
 

 This prayer we. think ought n of to have been granted..
 

 ?. The seventh prayer depends on the proposition, that the sources of-the two, rivers must-be fixed at that point in . their, respective channels, farthest removed from their respective mouths, at which water is found at all seasons of the'year.
 

 If the terms of this proposition be taken according to tlieir most obvious import, it would -seem to vary from-.the sixth only in this: that the sixth fixes ;the source of a river at the point in the .channel from .which water flows at all seasons in the year ; while the seventh fixes it at that point which is farthest removed from its mouth, at which water is-found at all seasons. Understanding it in this sense, the
 
 *439
 
 proposition would not raise the question, which of. several was the main branch ; but at what point the source of that main branch was to bé found.' The remarks made on the sixth prayer would .apply with equal propriety to this; and' the Court would come to the same conclusion, on both. But we understand from the argument, that the counsel for the plaintiff in érror, intended, by this prayer, to furnish a rule by which the main branch might be designated. That rule is, that the branch in whose channel water might bé found furthest removed from the mouth of the river, is its maid branch.
 

 Is this proposition universally true. That branch, of, a river, which is entitled to the appellation given to the main river, is a conclusion of fact to be drawn from the evidence . in the cause. Consequently no general rule can be laid down, which will, in all cases, guide us to-a correct conclusion. Onp of the forks may have retained the name of the main river, in exclusion of the others. The Scioto and Miami are both Indian names, and if any one branch of either had received from the natives, and retained exclusively, the name given to the main river,' that would have been the stream referred to in the reserve, contained in_the. deed of cession; although water might have been found in a dry season of the year, in the channel of some other, at a greater distance from the mouth of. the river; or the white ■men, who explored the country before the deed of cession . was executed, may have fixed the name on some one-of the branches of the respective rivers.
 

 When. France ceded to Great Britain all her pretensions to the country lying east of the Mississippi, “ from its source to the river Iberville,” no-man could have been so extravagant as to assert, that the source of the Mississippi was to be looked for through all its branches, and fixed at that point in the channel of either in which water might be found farthest removed frdm the mouth of the river.
 

 The size of the rivers, and the notoriety of tfié names by which they were designated, place the unreasonableness of such a pretension in so strong a point of view, that we can scarcely bring, ourselves to suppose that there is any resein-
 
 *440
 
 blance between the case put by way of illustration, and that under consideration. And yet, what is the real difference in . principle If one branch of a small river has by consent retained the name of the main river, in exclusion of the others, that branch must be considered, in the absence of other circumstances, as the true boundary iriteiided by the parties, in a deed which calls for the stream by its name. The fact .may be less certain and less notorious; but, if it exists, it must be followed by the same consequences.
 

 If neither branch had notoriously retained the.name of the river, the main branch is entitled to it. But the main branch is not necessarily that in. whose channel water might be found at all seasons of, the year, at the point farthest removed from its mouth. The largest volume of. wateir is certainly one indication of the- main stream, which does not necessarily accompany that which the counsel for the plaintiff in error has selected as the sole criterion by which it is -to be determined. The length'of the stream is another. It is obvious, that two. branches may pursue such a course that the source of' the longest may be nearer the mouth of. the river than that-of the'shortest.
 

 We think the rule proposed in this prayer does not furnish a certain guide to conduct us to the source-of the river; and therefore the instruction ought not to have been given.
 

 8. The eighth prayer requires the court to instruct the jury, that the source of each river is at jhat point farthest removed from its mouth, from which the'rain runs down into its channel.
 

 ,<We cannot perceive in the rule which this instruction proposes, any principle which wilh conduct us to.the soürce. of the main stream. Every objection to granting the seventh prayer, applies with equal force to this." They'need not be repeated. .
 

 The court did.not err in rejecting it. .
 

 The instructions to the jury, for which the plaintiff applied to the state court, are some of them mixed questions, involving fact with law, and requiring the court to decide the fact, ánd then to declare the-law upon that fact. Others propose a rule, as of universal application, to ascertain the main
 
 *441
 
 branch of ,a river, and the source of that main branch, ivhich would unquestionably, in mañy'cases, mislead us; They propose one single circumstance, in exclusion of all o,t.«rs, as being the infallible evidence of a complex fact depend ig on a number of varying circumstances..
 

 The court very properly refused to give any of these instructions.
 

 This Court is of opinion that there is no error in the judgment of thé state court, and that it ought to be affirmed with costs.
 

 (a)
 

 2
 
 United States Laws,
 
 440.
 

 (b)
 

 l
 
 United- States Laws,
 
 56S. 569.
 

 (a)
 

 2
 
 United States Laws,
 
 538.
 

 (b)
 

 3
 
 United States Laws,
 
 885.
 

 (a)
 

 2
 
 United States
 
 Laws, 270;
 

 (a)
 

 3
 
 United States Laws,
 
 592.
 

 (b)
 

 4
 
 United Slates Laws,
 
 455.
 

 (c)
 

 6
 
 United States Laws,
 
 282.