SALLY LADIGA, PLAINTIFF IN ERROR, v. RICARD DE MARCUS ROLAND, AND PETER HIEFNER, DEFENDANTS.

By a treaty made between the United States and the Creek tribe of Indians, east of the Mississippi river, on the 24th of March, 1832, it was stipulated.

1. That ninety principal chiefs of the tribe should be allowed to select one section each.

2. That every other head of a Creek family should be allowed to select one-half section each; and that these tracts should be reserved from sale, for their use, for the term of five years, unless sooner disposed of by them.

3. That twenty selections should be made, under the direction of the President, for the orphan children of the Creeks, and divided and retained or sold for their benefit as the President should direct.

In making the selections for the orphan children, the President had no authority, under the treaty, to choose any land embraced by the two preceding clauses. A grandmother, living with her grandchildren, was the head of a Creek family, and had a right to make a selection ; and the sale of her selection under the authority of the President was a nullity.

This case was brought up, by writ of error, under the 25th section of the Judiciary act, from the Supreme Court of the state of Alabama.

On the 24th of March, 1832, a treaty was made between the United States and the Creek tribe of Indians, east of the Mississippi river.

The articles of this treaty which bear upon the present case are as follow :

"Article I. The Creek tribe of Indians cede to the United States all their lands east of the Mississippi river.

"Art. II. The United States engage to survey the said land as soon as the same can be conveniently done, after the ratification of this treaty, and when the same is surveyed to allow ninety principal chiefs of the Creek tribe to select one section each, and every other head of a Creek family to select one-half section each, which tracts shall be reserved from sale for their use for the term of five years, unless sooner disposed of by them.  A census of these persons shall be taken under the direction of the President, and the selections shall be made so as to include the improvements of each person within his selection, if the same can be so made, and if not, then all the persons belonging to the same town, entitled to selections, and who cannot make the same, so as to include their improvements, shall take them in one body in a proper form.  And twenty selections shall be selected, under the direction of the President for the orphan children of the Creeks, and divided and retained or sold for their benefit as the President may direct.  Provided, however, that no selection or locations under this treaty shall be so made as to include the agency reserve.

"Art. III. These tracts may be conveyed by the persons selecting the same, to any other persons for a fair consideration, in such manner as the President may direct.  The contract shall be certified by some person appointed for that purpose by the President, but shall not be

Ladiga *v.* Roland et al.

valid till the President approves the same.    A title shall be given by the United States on the completion of the payment.

"Art. IV.  At the end of five years all the Creeks entitled to these selections, and desirous of remaining, shall receive patents therefor in fee-simple from the United States.

"Art. V.  All intruders upon the country hereby ceded, shall be removed therefrom in the same manner as intruders may be removed by law from other public land until the country is surveyed, and the selections made; excepting, however, from this provision, those white persons who have made their own improvements, and not expelled the Creeks from theirs.    Such persons may remain till their crops are gathered.    After the country is surveyed and the selections made, this article shall not operate upon that part of it not included in such selections.    But intruders shall, in the manner before described, be removed from the selections for the term of five years from the ratification of this treaty, or until the same are conveyed to white persons.

"Art. VI.  Twenty-nine sections in addition to the foregoing may be located, and patents for the same shall then issue to those persons, being Creeks, to whom the same may be assigned by the Creek tribe.

"Art. XV.  This treaty shall be obligatory to the contracting parties, as soon as the same shall be ratified by the United States."

Sally Ladiga claimed to be the head of a Creek Indian family, and, as such, entitled to a reservation of land.  Being ejected, she brought an action of trespass *quære clausum fregit* to try her title, in the Circuit Court of Benton county, state of Alabama, and recovered.  But the case having been carried to the Supreme Court of Alabama, the judgment was reversed.  Upon the certificate of the Supreme Court being produced in the Circuit Court, on the second trial, judgment was given for the defendant; which judgment was subsequently affirmed in the Supreme Court of the state.

To review this judgment the present writ of error was brought.

The facts of the case and ruling of the court are set forth in the following bill of exceptions.

Be it remembered that upon the trial of the above entitled cause the plaintiff claimed title to the land in controversy under and by virtue of the treaty made and concluded between the United States of America and the Creek tribe of Indians east of the Mississippi river, on the 24th day of March, A. D. 1832, the plaintiff introduced the following witnesses, viz.: Chr. A. Green, John Goodwyn, Hora-

tio .Griffin, Benjamin Pope, Thomas C. Henderson, John Boyd,
Thomas E. Montgomery, and Matthew M. Houston, by whom she
proved substantially the following facts:

1. That said plaintiff, at the date of treaty aforesaid, to wit, on the
24th March,. 1832, and long anterior to that period, and from thence
to the present time, was and is the head of the Creek Indian family
residing in and having an improvement upon the E half of section 2,
township 14, range 8 E, &c., in the district of land subject to sale at
Mardisville, in the state of Alabama, which land is situate in Benton
county, and is the same sued for in this action.

. 2. That the said land at the commencement of this suit, and ever
since; has been, and is worth three thousand dollars and more. That
the rents and profits of the same, since the institution of this suit,
have been worth more than two thousand dollars. That the rents and
profits have been received by defendants, who had the possession of
said land at and before the commencement of this suit, and from
thence until the present time.

3. It was further proved by said witnesses, that at no time was
there any other Indian improvement on the said land, and that the
improvement and residence of the plaintiff alone was embraced in
said half section by the legal lines of survey, and that plaintiff had
lived there for many years, and raised a numerous family of children.

4. It was further proved, by the production of the census roll
taken by order of the government of the United States, of the heads
of families of the Creek tribe, in conformity with the second article
of the treaty aforesaid, that the plaintiff was duly enrolled by the
agent of the United States charged with this duty, as one of the
heads of families belonging to the said Creek tribe, and as entitled to
land under said treaty—her identity being shown by the witnesses:

5. That in 1834, the government, by agents charged with this
duty, located the Indians. That the formula of location, as practised
by said agent, consisted in calling the Indians belonging to the
respective Indian towns together, and in the presence of the chiefs
and head men in the town, the agent would call over the names regis-
tered by the enrolling agent as being the heads of families in that
town. That the persons whose names were so registered would ap-
pear and answer to their names, and their identity and residence, and
also their improvements, would be proved, &c., pointed out by the
chiefs and head men so assembled; and the agent would then desig-
nate by figures and letters, the land opposite the name of each re-

servee on said census roll, to which he supposed them entitled under the treaty.

6. That upon the agent coming into the Tallasahatchee town of Indians, for the purpose of making the locations aforesaid, the plaintiff appeared before him, and being identified as the same whose name was enrolled on the census list of said town, claimed the land in dispute, on which her improvement, at the date of the treaty aforesaid, was situated, and which she then informed him she had selected as her reservation—there being no other improvement, location, or conflicting claim thereto at that time. That the deputy locating agent, who located the town to which she belonged, not regarding her the head of a family, by reason of her children having married and left her, and none but orphan grandchildren residing with her, refused to recognise her rights under the treaty, or set apart the land so by her selected opposite her name on the roll, as in other cases. That from the date of the treaty aforesaid, until the year 1837, she made continual and repeated applications to the government officers to assert her rights to said land, and through them to the government itself; until, in 1837, she was forced to leave the country and emigrate to Arkansas, by the armed troops in the employ and under the directions of the government. That she never had abandoned her claim, but insisted on her right under the treaty, to enforce which this action was brought. M. M. Houston, who was the locating agent, testified as to the reasons which induced him to refuse a recognition of plaintiff's right.

The defendant then introduced a patent or grant from the United States, signed by the President, Martin Van Buren, dated the 21st day of December, 1837, which, after reciting that by virtue of the treaty aforesaid of the 24th March, 1832, between the United States and Creek tribe of Indians, the United States agreed that twenty sections of land should be selected, under the direction of the President, for the orphan children of said tribe, and divided and retained or sold for their benefit, as the President might direct; and that the President, in making such selection, had included section 2, township 14, range 8 east, and divided the same into quarter sections; and said tract having been sold pursuant to instructions, Canton, Smith, and Heifner had become the purchasers of the south-east quarter of said section; which purchase had been sanctioned and approved by the President on the 3d November, 1836—gave and granted to said Canton, Smith, and Heifner, the said south-east quarter, to them their

heirs, &c., for ever, as tenants in common, and not as joint-tenants: which grant being properly attested, was read to the jury. Another patent or grant from the government of the United States, similar in all its form to that above named, and containing like recitals, bearing the same date and properly authenticated, conveying the north-east quarter of said section to Richard de. Marcus Roland, was offered and read to the jury. And this being all the testimony, the plaintiff's counsel asked the court to charge the jury as follows:

  1. That if they believed from the evidence that the defendants were in possession of the land sued for at the institution of this suit, and continued to hold the same adversely, receiving the rents and profits thereof; and that if from the evidence the jury were further satisfied that the plaintiff, at the date of the treaty made and concluded at the city of Washington between the United States of America and the Creek tribe of Indians east of the Mississippi river, to wit, on the 24th day of March, 1832, was the head of a Creek Indian family, and that the United States enrolled her name under the provisions of the treaty aforesaid, requiring a census to be taken, &c., as the head of a Creek family; and that said plaintiff, before and at the time of the ratification of said treaty, and from thence until she was forced to leave the country by the United States, possessed said lands sued for, having an improvement and residence upon the same; and if the jury believe from the testimony that said plaintiff did select the said half section, including her improvement, and that such selection was so made without conflicting with the rights of any other Indian, or the rights or duties of the government reserved, secured, or prescribed by the treaty aforesaid, and if the proper officers of the government were duly notified of such selection by the said plaintiff, and that she had never forfeited her rights by a voluntary abandonment of the lands sued for, but had been compelled by force or coercion on the part of the United States, to emigrate from the country and leave the land, then the plaintiff is entitled to recover in this action.

  2. The plaintiff asked the further charge—that under the second article of the said Creek treaty of the 24th March, 1832, each head of a Creek Indian family, after the land ceded by said treaty had been surveyed, was entitled to select a half section of land so as to include their improvement, if the same could be made; and if the jury believed from the proof that the plaintiff was the head of a Creek family, and entitled to a selection under the treaty, and that

after such survey she could select, and did select, the half section in dispute, and in a reasonable time notified the government of such selection, and had never voluntarily abandoned said land; then plaintiff in such case acquired a vested right to said land inchoate, but sufficient under the laws of this state, coupled with possession, to maintain this action, and that such right could not be defeated by the subsequent disposition of the same by the United States to the defendants.

3. The plaintiff asked the court further to charge the jury: that if the plaintiff was entitled to select a half section of land, under the treaty aforesaid, as the head of a Creek family, duly enrolled as such, and the selection could have been so made, and was so made, as to include her improvement within the selection; that in such case the treaty itself located the plaintiff; and if the government, with a knowledge of such selection and location, exposed the land to sale, or reserved it for other purposes, such sale or disposition could not prejudice the right of the plaintiff. All which charges the court refused to give, and in lieu of them charged the jury: that notwithstanding the plaintiff was the head of a Creek family, duly enrolled as such by the authorized agent of the government, and entitled to select a half section under the second article of the treaty of the 24th March, 1832; and that although, after the land ceded by the treaty aforesaid had been surveyed, she could have selected, and did select, the half section in dispute, which included her improvement, and of which selection she duly notified the government; yet the refusal of the locating agent to recognise her right and to set apart the land by a designation of it opposite her name upon the roll, as in other cases of location, coupled with the subsequent sale and grants of the same land to the defendants by the United States, whether right or wrong, divested the plaintiff of all right to said land, and vested in the defendants in this action titles paramount, which the plaintiff could not gainsay or dispute. To which refusals of the court to give the charges asked by the plaintiff, and to the charge given in lieu of them by the court, the plaintiff excepts, and now here tenders this bill of exceptions, which is signed and sealed by the court, and ordered to be made a part of the record of this cause, which is accordingly done.

This opinion of the court of Benton county being, as has been said, affirmed by the Supreme Court of the state of Alabama, the present writ of error was brought to review it.

*Coxe,* for the plaintiff in error.

*Coxe* referred to the treaty, (8 Laws United States, 1077,) and commented on the several articles of it. He then argued that the treaty, *per se,* vested a title in the plaintiff, and cited the following cases where the point had been decided as arising under a treaty of 1819 with the Cherokees. 3 Yerger, 445, 452; 7 Yerger, 46; 8 Yerger, 249, 461; 6 Porter, 327, 413.

Mr. Justice BALDWIN delivered the opinion of the court.

Both parties claim the land in controversy under the United States, in virtue of the treaty of Washington, made on the 24th March, 1832, between the United States and the chiefs of the Creek tribe of Indians. The decision of the Supreme Court of Alabama was against the title set up by the plaintiff, the case is therefore properly brought here under the 25th section of the Judiciary act of 1789. [The articles of the treaty are set forth in the statement of the reporter.] By an inspection of the second article it will be seen, that there are three distinct classes of selections to be made from the ceded lands, for the benefit of the Indians, after the lands are surveyed.

1. The United States engage to allow ninety principal chiefs to select one section each.

2. And every other head of a Creek family to select one half section each, which tracts shall be reserved from sale for their use for the term of five years, unless sooner disposed of by them. A census is to be taken of these persons, and the selections are to include the improvements of each person within his selection.

3. And twenty sections shall be selected under the direction of the President, for the orphan children of the Creeks, and divided, retained, or sold, for their benefit, as he may direct.

By article third these tracts may be sold by the persons selecting them, to any persons, as the President may direct, and a title shall be given by the United States, on the completion of the payment of the consideration. The fourth article stipulates, that at the end of five years, those entitled to these selections, who are desirous of remaining, shall receive patents; and by article fifth, all intruders shall be removed from these selections, for five years after the treaty, or until the same are conveyed to white persons. By article sixth, twenty-nine sections more may be located, and patents shall issue to the Creeks to whom the same may be assigned by the tribe. The fifteenth article makes the treaty obligatory on the parties, when ratified by the United States.

Ladiga v. Roland et al.

The engagements of the treaty then are, to allow the chiefs and heads of families to select, for their own use, and reserve from sale for five years, the lands selected, that they may be sold and conveyed with the approbation of the President, and titles to be given by the United States, on payment of the purchase-money, and at the end of five years to give patents to all who are entitled to select and desirous of remaining, and to remove intruders from their selections, during that time, till they are conveyed to white persons.

The lands to be selected for the orphans are placed under the exclusive direction of the President, as to their location and disposition, and are not embraced in the third or fourth articles, which are confined to selections made by the Indians themselves,—these are expressly reserved from sale for five years, whereas the selections for orphans may be made and the lands sold at any time the President directs.

No authority is given to the President to direct the selection of the twenty sections for orphans, on or out of those made by the chiefs or the heads of families, or those sections which the tribes may assign under the sixth article; all the lands so selected or located are placed beyond the power of any officer, consistently with the obligatory engagements of the treaty on the United States. In directing the selections for orphans, the treaty did not intend, and cannot admit of the construction, that they might be made on lands selected according to the first part of the second article. The provisions of the treaty were progressive—that relating to orphans is entirely prospective. "It is a principle which has always been held sacred in the United States, that laws by which human action is to be regulated, look forward, not backward, and are never to be construed retrospectively, unless the language of the act should render that indispensable. No words are found in the act which renders this odious construction indispensable." 2 Peters, 434. The last clause in this article cannot have been intended to annul or impair a title which was valid under the first clause, and guarantied from intrusion under the fifth article for five years, unless sooner sold. S. P. 9 Wheat. 479.

Thus taking the treaty, and applying it to the evidence given at the trial, the instructions prayed of the court, and those given to the jury, it will not be difficult to decide in which party is the right of this case.

The plaintiff "proved substantially the following facts." [For the facts proved upon the trial, see the statement of the reporter.]

From the evidence it appears that the plaintiff claimed under the

first, and the defendants under the second clause of the second article of the treaty; that the plaintiff was the head of a family within the description, and had complied with all the requisites of the treaty, had selected the tract whereon her improvements were, where she resided before, at the time of the treaty, and until her expulsion therefrom by military force, on the frivolous pretence that she was not the head of a family, her children having married and left her, and none but her grandchildren lived with her. The defendants claimed under the second clause of the second article, relating to orphans' selections, by two patents dated in 1837, each for a quarter section, being the two halves of the half section selected by the plaintiff, which patents issued pursuant to a sale made by the agent appointed by the President, and affirmed by him in November, 1836, five months before the expiration of five years from the ratification of the treaty, and while the land was expressly reserved from sale. The defendants gave no other evidence of title.

This sale was a direct infraction of the solemn engagements of the United States in the treaty. Though approved by the President, if the plaintiff had previously selected it according to the stipulations of the treaty, in such case the sale was a nullity, for the want of any power in the treaty to make it. The President could give no such power, or authorize the officers of the land-office to issue patents on such sales; they are as void as the sales, by reason of their collision with the treaty. The only remaining inquiry is into the plaintiff's title. No other objection has been made to it, than the refusal of the locating agent or his deputy, to recognise her right, under the treaty, or to set apart the land so located by her opposite her name on the roll, as in other cases, solely for the reason he assigned. We cannot seriously discuss the question, whether a grandmother and her grandchildren compose a family, in the meaning of that word in the treaty, it must shock the common sense of all mankind to even doubt it. It is as incompatible with the good faith and honour of the United States, and as repugnant to the Indian character, to suppose that either party to the treaty could contemplate such a construction to their solemn compact, as to exclude such persons from its protection, and authorize any officer to force her from her home into the wilds of the far west. Such an exercise of power is not warranted by the compact, and the pretext on which it was exercised is wholly unsanctioned by any principle of law or justice.

Having a right by the treaty to select the land of her residence;

having selected, and been driven from it by lawless forces, her title remains unimpaired. She has not slept on her rights, but from 1832 to 1837 has made continuous and repeated applications to the government officers to assert her rights to said land, and through them to the government itself in 1837. She has never abandoned her claim, but has insisted on her rights under the treaty.

In our opinion, the plaintiff not only has a right to the land in question under the treaty, but one which it protects and guaranties against all the acts which have been done to her prejudice; and we are much gratified to find in the able and sound opinion of the Supreme Court of Tennessee, on the Cherokee treaty of 1819, and the Supreme Court of Alabama on this treaty, a train of reasoning and conclusions which we very much approve, and are perfectly in accordance with our opinion in this case. These cases are reported in 2 Yerger, 144, 432; 5 Yerger, 323; 5 Porter; Alabama Rep. 330, 427.

The judgment of the Supreme Court of Alabama is therefore reversed.

#### ORDER.

This cause came on to be heard on the transcript of the record, from the Supreme Court of the State of Alabama, and was argued by counsel, on consideration whereof; It is now here ordered and adjudged by this court, that the judgment of the said Supreme Court of the state of Alabama in this cause be, and the same is hereby reversed with costs; and that this cause be, and the same is hereby remanded to the said Supreme Court of the state of Alabama, that further proceedings may be had therein in conformity to the opinion of this court, and as to law and justice shall appertain.