## MILLET et al. v. BILBY et al.

No. 12395—Opinion Filed June 9, 1925.

### Indians—Creek Allotments—Validity of Conveyance Before Issuance of Patent.

Under the Original and Supplemental Creek Agreements (31 Stat. 861, 32 Stat. 500), the formal application filed with the Commission to the Five Civilized Tribes, wherein a member of the Creek Tribe of Indians designated the land he desired as his allotment, constituted a selection of said allotment, which was the inception of his title thereto, vesting an equitable interest therein, and, subject to restrictions imposed, the same could be conveyed; such conveyance becoming entirely effective upon the issuance, thereafter, of the allotment certificate and the patent, which became effective by relation as to the date of selection.

(Syllabus by Jarman, C.)

Commissioners' Opinion, Division No. 2.

Error from District Court, Wagoner County; E. A. Summers, Judge.

Action by Lizzie Millet and others against Russell I. Bilby and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

F. F. Betzer, for plaintiffs in error.

J. C. Graves and W. O. Rittenhouse, for defendants in error.

G. Earl Shaffer and C. B. Ames, amici curiae.

Opinion by JARMAN, C. This action involves the homestead portion of the allotment of Alice Millet, a duly enrolled Creek freedman citizen of the Creek Tribe of Indians, who died in 1906. On September 24, 1907, prior to statehood, the administrator of the estate of said Alice Millet, deceased, appeared before the Commissioner to the Five Civilized Tribes at Muskogee, and filed a formal application for said land as the homestead portion of the allotment of said deceased. On June 24, 1908, after statehood and after the nine months' period for contesting the rights of Lizzie Millet to said land had expired, a certificate of allotment was issued in the name of Alice Millet, and, on March 10, 1909, the homestead deed was issued.

Said allottee died intestate without issue, and left surviving, her mother, who was a duly enrolled freedman citizen of the Creek Tribe of Indians; a father, who was a non-citizen, and certain brothers and sisters, or their representatives. The father died intestate in 1917. This action was begun by the brothers and sisters, or their representatives, to recover the interests which they claimed to have inherited in said homestead.

The plaintiffs contend that, since the certificate of allotment did not issue until after statehood, descent was cast under the Oklahoma law, which gave to the plaintiffs an interest in said land. The defendants contend that the inception or the beginning of the title was the selecting of the land as the homestead portion of the allotment of the deceased allottee, which was effected by the filing of the formal application therefor, with the Commissioner to the Five Civilized Tribes, and that the certificate of allotment and the patent or deed thereafter issued related back and took effect as of the date of the selection; that under the Arkansas law, which governed at that time, the mother, being the only parent of Creek blood, inherited the entire estate. The trial court sustained the contentions of the defendants.

The one question to be determined is, Did the application for the allotment or the issuance of the certificate therefor constitute the inception of title? To answer this question, it is necessary to consider certain treaties and legislation concerning the title to this land. The United States made a treaty with the Creek Tribe of Indians in 1833, whereby the Creek Tribe surrendered the lands held by them east of the Mississippi river in consideration of the United States conveying, to them, a tract of land in the Indian Territory, now a part of the state of Oklahoma, to which they agreed to move. In 1852, a deed or patent, pursuant to this treaty, was issued by the United States, by which said lands were granted or conveyed to the Creek Tribe of Indians, with the provision that said lands should revert to the United States upon the tribes ceasing to occupy the same. The Creeks, pursuant to the terms of said treaty, settled upon and occupied said land and established their government. In 1893, in keeping with the policy of dissolving the tribal relations and distributing the lands among the members of the tribe, realizing that the Indian Territory would become a part of a state, Congress passed an act giving the consent of the United States to the allotment of the lands of the Creek Nation in severalty, not to exceed 160 acres to any individual member, and section 16 of this act (27 Stat. at L. 645) provided for the appointment of commissioners to negotiate with the Creek Tribe as well as with the other Nations of the Five Civilized Tribes, looking to the dissolution of the tribal government and to the extinguishment of the tribal title to the lands, and the distribution or allotment thereof in severalty among the individual members of the tribe. On March 8, 1900, an agreement was entered into, known as the Original Creek Allotment Agreement, between the Commissioner to the Five Civilized Tribes and the Creek Tribe of Indians, with reference to the dissolution of the tribal government and the allotment of the lands in severalty, which agreement was approved by Congress March 1, 1901, and ratified by the Creek National Council May 25, 1901 (31 Stat. at L., 861). This Original Agreement was thereafter modified by the agreement known as the Supplemental Creek Allotment Agreement, approved by Congress June 30, 1902, and ratified by the Creek Tribe of Indians on July 26, 1902 (32 Stat. at L. 500).

Up to the time of the Original Agreement, the lands of the Creek Nation were owned by the tribe subject to restrictions imposed by the Congress against alienation and subject to the reversionary interest of the United States. In the Original Agreement, the

United States agreed that the members of the tribe might acquire individual and private ownership of tracts of land to be known as allotments, which they were privileged to select, and their selection could not be disturbed except by a paramount right of another member of the tribe, and further agreed that the United States would relinquish its reversionary interest in said lands upon the ratification of said agreement by the tribe. By adopting this 'treaty, the Creeks, as a nation, reilnquished valuable rights, to wit, the ownership by it, as a sovereign nation, of its tribal lands and permitting those lands to become the individual property of its members.

As to the rights of the members, with reference to their acquiring their individual allotments, they had but one source to look to and that was the Original and Supplemental Agreements, and, no doubt, the representatives of the tribe, for and on behalf of the individual members thereof, thoroughly considered the provisions of these agreements, submitted to them for ratification by the United States, as to their rights to select their own allotments without the interference of anyone, before they ever agreed or consented to become parties to this contract. This contract, which is one between two nations, the United States on the one hand, and the Creek Tribe of Indians on the other, is the highest form of agreement and the most solemn compact known to the law —a treaty between nations. What did this treaty provide? The first section thereof defined certain terms used in the treaty. The second section provided for the appraisal, under the direction of the Dawes Commission, of the tribal lands. Section 3 provided that the lands of the tribe should be allotted among the members thereof by the Commission so as to give to each member 160 acres, "which may be selected by him"; nothing is said about the issuance of a certificate of allotment. Section 4 provides for the selection of allotments for minors, incompetents, etc. Section 6 provides that all controversies arising between citizens as to their right to select certain tracts of land shall be determined by the Commission. This clearly implies that the United States had nothing whatever to do with the right of the Indian to select his allotment and the only authority the government had, through its arm, the Commission, was to settle controversies arising between citizens as to their right to select certain tracts of land as their allotments. It is clear, therefore, that the Congress, in submitting the Original Agreement, and the

Indians, in ratifying it, understood that the individual members of the tribe had absolute authority, without dictation or interference on the part of the United States, to choose or select their own allotments, and, in this connection, it is well to bear in mind that there is no provision in the agreement with reference to the government's issuing a certificate of allotment, and it is mentioned only in an incidental way, and then only as evidence of the right to the allotment. There was no contract entered into between these nations recognizing that the United States was to issue a certificate of allotment and there is nothing in this treaty to indicate that the rights of the individual members of the Creek Tribe, in any way, were made to depend upon the issuance of the certificate of allotment. Section 8 unquestionably makes plain, if what we have already stated has not done so, the clear and unmistakable intention of both of the contracting parties, the United States and tribe, with respect to the right, not privilege, of the members of the tribe to select their own allotments. This section provides that the Secretary of the Interior shall, through the United States Indian Agent, in the Indian Territory, immediately after the ratification by the Creek Tribe of Indians of the Original Agreement, put each member of the tribe, "who has made selection of his allotment," in the unrestricted possession thereof, and to remove from the land all persons who might be objectionable to the member of the tribe entitled thereto. This provision recognized that a member of the tribe acquired an interest in the allotment when he made his selection thereof. This provision, of course, pertains only to that class of Indians, who had, prior to the taking effect of the Original Agreement, made his selection of allotment. Where selections had already been made, there existed evidence of the selection by the open acts of the individual Indian in designating or identifying his allotment by his exercising dominion over the same and, therefore, it did not require any further evidence that his selection had been made; but, as to that class of Indians who had not made selection of allotment at the time of the taking effect of the Original Agreement, it was necessary that there should be some evidence that they also had made selection of allotment, so others would not attempt to file on the same land, and in order to prevent confusion, the latter part of section 8 provided that when any citizen shall thereafter make selection of his allotment and receive his certificate therefor, which was merely

evidence that such selection had been made, he likewise shall be immediately placed in possession of his allotment.

Section 3 of the Original Agreement provided that the lands of the tribe shall be **allotted** among the members by the Commission, and the word "allot" is used in other sections of said agreement, but nowhere in said agreement is the term defined. We agree with Mr. Schaffer, who appears as amicus curiae, and has filed a brief herein in support of the contentions of plaintiffs in error, that the word "allot," as used in said Original Agreement, is not a term of sale or grant, but of apportionment of that to which the parties are entitled as of right, as held by the court in the case of Parr v. United States, 153 Fed. 462, 468, as follows:

"The word 'allot', as used in an act for the allotment of lands to Indians in severalty according to the size of the families, * * * is not a term or grant but of apportionment of that to which the parties are entitled as a matter of right."

The right to the allotment already existed and the United States, by the allotment or certificate, merely set aside to the Indian the land that was rightfully his, after he had made his selection.

The term "select" is not defined in the Original or the Supplemental Agreement. The term, however, is defined in section 6 of the Cherokee Allotment Agreement, which was approved July 1, 1902, as follows:

"The word 'select' and its various modifications, as applied to allotments and homesteads, shall be held to mean the formal application at the Land Office to be established by the Dawes Commission for the Cherokee Nation for particular tracts of land."

The term "select" is again defined in the Choctaw-Chickasaw Supplemental Agreement, section 6, as follows:

"The word 'select' and its various modifications as applied to allotments and homesteads shall be held to mean the formal application at the land office to be established by the Commission of the Five Civilized Tribes for the Choctaw-Chickasaw Nation for particular tracts of land."

It must be borne in mind that both the Cherokee Allotment Agreement and the Choctaw-Chickasaw Supplemental Agreement were adopted July 1, 1902, which was only one month after the approval of the Supplemental Creek Agreement, and we think it would be a violent presumption to say that the Congress intended to give the term "select'" a different meaning in the agreement with the Cherokee Tribe and the Choctaw-Chickasaw Tribes from that it intended to give to the term in the agreement with the Creeks, as they are all members of the Five Civilized Tribes and were being dealt with together in the general Act of 1906. The term "select," as applied to the obtaining of an allotment and as defined in the treaties above referred to, means the formal application for the allotment.

Sections 37 and 38 of the Original Agreement provided that any citizen, after selecting his allotment, could rent the same for a term not exceeding one year, and, also, could dispose of the timber thereon Unquestionably, both of the contracting parties recognized that the members had an interest in the allotment after they had selected the same; otherwise they would not have been given the right to exercise dominion over the same by renting it and by impairing its value by removing the timber therefrom. Section 18 of the Supplemental Creek Agreement provided that, any person desiring to graze cattle upon lands "allotted or selected for allotment," the owner should first obtain a permit from the United States Indian Agent, authorizing the introduction of the cattle, and providing further that cattle so introduced and all other live stock owned or controlled by noncitizens should be kept upon enclosed lands, and if any such cattle or other live stock trespassed upon the lands allotted to or selected for allotment by any citizen of the Creek Nation, the owner was required to make reparation to the party injured for the damages sustained. In this section, the citizen who had selected his allotment was placed on an exact footing with those to whom lands had been allotted. If citizens who had selected their allotment did not have any interest therein, why should they be entitled to damages to the estate?

It seems that the Original and Supplemental Agreements, when considered in their entirety, can admit of no other meaning than that each member of the tribe had the absolute right, without the interference on the part of any one, to designate and to say what tract of land should be his allotment. The matter of the selecting of an allotment by the individual members of the tribe was not a privilege conferred upon the members but it was the exercising of an absolute right. The Creek Nation owned the legal title to all of this land, not the United States government, and the allotting of the land was in the nature of a partition of the same among its members, so, when the members

selected their allotments, they merely asserted their rights to what belonged to them. The United States could not interfere with, nor deny the right of, a member of the tribe in the selection of his allotment, and the only thing it could do was to act through the Commission in a judicial capacity, in settling controversies as to conflicting interests between members of the tribe as to disputed rights to allotments.

If there should be any doubt as to the meaning of the Original Agreement, we would have the right and it would be our duty to consider subsequent congressional legislation as to the interpretation of the agreement. Tiger v. Western Inv. Co., 221 U. S. 286. In subsequent legislation by the Congress, which pertained to the Creek Tribe of Indians, as well as to the other Nations of the Five Civilized Tribes, the Congress provided, in section 22 of the Act of April 26, 1906 (34 Stat. at L. 137), that the adult heirs of any deceased Indian of' either of the Five Civilized Tribes **"whose selection has been made,"** or to whom a deed or patent has been issued, for his or her share of the land of the tribe, may sell and convey the lands inherited from such decedent. This section clearly recognized that the allottee acquired a right or interest in the land when he made his selection of allotment—the right of an Indian who had selected his allotment was put on the same footing as that of the Indian who had received a patent or deed, thus recognizing the fact that it was the selecting of the allotment that established the right, and that the certificate, deed, or patent is but the evidence of the right. The leading case upon which counsel for plaintiff in error rely to support their position is that of McDonald v. Ralston, 65 Okla. 277, 166 Pac. 405, but an analysis of that case shows it is the filing, another way of saying "selecting," the allotment, that creates the equitable title to the allotment, and that the certificate of allotment is merely the evidence of the equitable title, as shown by the following language used by the court in said case on page 408:

'The statute deals with patents and deeds but the equitable title to the allotment rests in the allottee or his heirs whenever the filing is made, which is evidenced by what is known as a certificate of allotment."

In the case of McWilliams Inv. Co. v. Livingston, 22 Okla. 884, 98 Pac. 914, the court, speaking through Mr. Justice Dunn, with reference to the time when descent of lands

of a deceased Creek Indian is cast, uses the following language, at page 888:

"We are not advised as to the practice obtaining in reference to these certificates, whether in fact any were issued or not, nor do we regard this as very material or controlling in the case, for in our judgment, the date of the right to alienate or transfer on the part of the allottee subsequent to April 21, 1904, related solely to the time when such allottee actually made or selected his allotment, and when he had done the things necessary to secure the equitable interest or title therein, entitled him to the patent."

This court, in the case of Hooks v. Kennard, 28 Okla. 457, 114 Pac. 744, at page 463, uses the following language:

"This court has held in several cases that the selection of, and the filing upon, an allotment of land was the inception and beginning of the title of the allottee or his heirs, and that, when the patent which is only the evidence of title is issued, it relates back to the inception of the title."

Again in the case of Reynolds v. Brooks, 49 Okla. 188, 152 Pac. 411, this court, at page 195, stated:

"The selection and filing upon an allotment is the inception of title, and when a patent is issued it relates back to the inception of title."

In the case of Homer v. Lester, 95 Okla. 284, 219 Pac. 392, in speaking of the law of descent as affected by section 22 of the Act of 1906, the court uses the following language, at page 396, to wit:

"* * * No distinction is made between lands technically inherited and lands allotted to heirs, except the descent is not cast until the allotment is selected."

In the case of Ned v. Countiss, 84 Okla. 138, 203 Pac. 168, the following language is used:

"It has been consistently held by this court that the selection of and filing upon an allotment of land was the inception of title of the allottee or his heirs, and that when the patent, which is only the evidence of title, is issued, it reverts back to the inception of the title."

In the case of McDonald v. Ralston, supra, the court held:

"The decisions of the federal courts are controlling on questions involving allotment acts relating to members of the Five Civilized Tribes."

Bearing this principle in mind, we will resort to the last case that has been brought to our attention, decided by the federal court, being that of Thomason v. Wellman

& Rhodes, 206 Fed. 895, wherein the following rule is announced:

"A member of the Chickasaw Tribe having 'selected' and designated land as her surplus allotment, by formal application at the land office, as provided by the Choctaw and Chickasaw Supplemental Agreement (Act July 1, 1902, c. 1362, par. 6, 32 Stat. 641), thereby doing all that the law requires of her to entitle her to a patent, she then had an equitable interest in the land, which she could at once convey; such conveyance becoming entirely valid and effective, on an allotment certificate issuing to her after expiration, without contest, of the nine months within which, under paragraph 71, her right could be contested, and a patent thereafter issuing to her, effective by relation as of the date of her selection."

In the body of the opinion of the Thomason Case, supra, the following language is used at page 897:

"The allotment certificate was the evidence that a selection had been made, but its issuance did not constitute the selection itself. That was done by formal selection of the surplus allotment on September 19, 1904, at the local land office. Sallie Duncan did all that the law required of her to entitle her to a patent for the land, and the fact that her formal application was subject to contest during a period of nine months in no way affected her equitable interest in the land selected. She subsequently received the allotment certificate, and later a patent for the land; there having been no contest of her selection. The patent issued to her for the land, by relation, became effective as of the date of her selection, namely, September 19, 1904."

From the foregoing authorities, we are forced to the conclusion that the equitable title in and to the land in question attached on September 24, 1907, when selection of the allotment involved herein was made, and that the certificate of allotment; and the deed or patent thereafter issued, dated back and took effect as of the date of selection.

The leading case relied upon by plaintiffs in error, as heretofore stated, is that of McDonald v. Ralston, supra, wherein it is held that descent is cast at the time the certificate of allotment is issued. That case, as well as others, purporting to make a similar holding, is not authority for the position of plaintiffs in error in the instant case for the reason that there was not involved in those cases the question of the filing or the selection of allotment by the allottee. In the Ralston Case, the allottee died in August, 1900, and her certificate of allotment was issued on January 2, 1908. The record is silent as to when the allotment was selected and the only question the court had before it in that case was whether the descent was cast at the date of the death of the allottee or when the certificate of allotment was issued.

For the reasons herein given, the judgment of the trial court is affirmed.

By the Court: It is so ordered.

Note.—See under (1) 31 C. J. pp. 510, 511.