### ST. MARIE et al. v. UNITED STATES et al., and seventeen other cases.
### No. 9089.

Circuit Court of Appeals, Ninth Circuit.
Jan. 3, 1940.

---

[5] Titan Metal Mfg. Co. v. N. L. R. B., 3 Cir., 106 F.2d 254.

[6] National Labor Relations Board v. Griswold Mfg. Co., 3 Cir., 106 F.2d 713.

Thomas L. Sloan, of Palm Springs, Cal., and J. W. Henderson, of San Francisco, Cal., for appellants.

Norman M. Littell, Asst. Atty. Gen., C. W. Leaphart, Sp. Asst. to Atty. Gen., Norman MacDonald, of Washington, D. C., and John L. Wheeler, Attys., Department of Justice, Ben Harrison, U. S. Atty., and Russell K. Lambeau, Asst. U. S. Atty., all of Los Angeles, Cal., for appellees.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Eighteen suits were brought by members of the Agua Caliente band of Mission Indians to obtain adjudications that allotments of tribal lands had been made to them, and that they were entitled to trust allotment patents. The cases were consolidated for trial, and decrees were entered against the Indians, of which review is here sought.

There are several bands of Mission Indians. The Act of January 12, 1891, Ch. 65, 26 Stat. 712, hereafter called the Mission Indian Act, was enacted "for the relief" of such Indians. The act provided, in general, for the selection of reservations, and for allotments in severalty. Provision was made in the first three sections for the appointment of three commissioners who were "to select a reservation for each band or village of the Mission Indians", which selection was to be valid when approved by both the President and the Secretary of the Interior, after which patent was to issue for each reservation to the band occupying the same.

In conformity with that act, three commissioners were appointed, and they recommended that a reservation of 6 sections in one township, and 1 section in another township be reserved for the Agua Caliente band. The President and the Secretary of the Interior approved the report of the commissioners, on December 29, 1891, and the lands mentioned were withdrawn. The quantity of land in the reservation has been greatly increased by further withdrawals for that purpose. Lands were patented

GARRECHT, Circuit Judge, dissenting in part.

to the band on May 14, 1896, on October 29, 1906, on January 5, 1911 and on March 29, 1923, and in addition a section and a quartersection were purchased for the band. The reservation is near and almost surrounds Palm Springs, California. The Agua Caliente band is located on this reservation.

The Mission Indian Act in §§ 4 and 5 made provision for allotments in severalty. The material parts of these sections are:

"Sec. 4. That whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians, out of the land of such reservation, in quantity as follows: [specifying quantities of grazing and arable land to be allotted].

"Sec. 5. That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made * * *."

The Secretary of the Interior made no attempt to allot any of the lands until enactment of the Act of March 2, 1917, Ch. 146, 39 Stat. 969, 976.

Section 3 of the act last mentioned amended § 3 of the Mission Indian Act and authorized "the President, in his discretion and whenever he shall deem it for the interests of the Indians affected thereby, to extend the trust period for such time as may be advisable on the lands held in trust for the use and benefit of the Mission Bands or villages of Indians in California". It further provided: " * * * That the Secretary of the Interior be, and he is hereby, authorized and directed to cause allotments to be made to the Indians belonging to and having tribal rights on the Mission Indian reservations in the State of California, in areas as provided in section seventeen of the [Act of June 25, 1910, 36 Stat. 859], instead of as provided in section four of the [Mission Indian Act]. * * *"

The Act of June 25, 1910, Ch. 431, § 17, 36 Stat. 855, 859, 25 U.S.C.A. §§ 331, 336,

mentioned in the preceding statute, is an amendment of the General Allotment Act, Act of February 8, 1887, Ch. 119, 24 Stat. 388, 25 U.S.C.A. § 331 et seq.

The General Allotment Act was intended to be and was a general act relating to all Indian reservations, except certain ones named in § 8, 25 U.S.C.A. § 339. The Mission Indian reservations were not excepted, undoubtedly because at that time no reservations for the Mission Indians had been made. Section 1 of the General Allotment Act authorized the President to survey reservations and allot the lands therein in severalty in specified quantities. Section 2 provided that "all allotments set apart under the provisions of this act [of sections 331 to 334, inclusive, and 336] shall be selected by the Indians, heads of families selecting for their minor children, and the agents shall select for each orphan child * * *". Section 3 provides for the making of allotments "by special agents appointed by the President for such purpose, and the agents in charge of the respective reservations * * *" and for certification of such allotments. Section 5 is nearly identical to § 5 of the Mission Indian Act in the part thereof quoted, and provides for issuance of a trust patent upon approval of the allotments. The Act of June 25, 1910, Ch. 431, § 17, 36 Stat. 855, 859, 25 U.S.C.A. § 331, amended § 1 of the General Allotment Act, as previously amended, but only as to the areas to be allotted, requiring the President to cause allotments "to be made in such areas as in his opinion may be for their best interest not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian. * * *"

It should be noted that there are important differences between the General Allotment Act and the Mission Indian Act. The former provides for survey of lands, appointment of allotting agents, selection of lands by Indians, and certification of allotments. None of these features are found in the Mission Indian Act.

On June 7, 1921, the Secretary of the Interior appointed one Wadsworth a special allotting agent at large for the Mission Indian reservations in California, effective July 1, 1921, and authorized him to survey and classify the lands in the Agua Caliente reservation, prepare an allotment schedule and issue certificates of selection. Wadsworth prepared an allotment schedule in 1923 and issued certificates of selection. In

preparing the allotment schedules in 1923, Wadsworth made arbitrary or compulsory selections for Indians who failed or refused to make selections. Subsequently he was directed to prepare new allotment schedules containing only selections voluntarily made by the Indians. In 1927, Wadsworth prepared new allotment schedules, and issued certificates of selection.

The classification of the lands in the reservation resulted in three classes; desert lands, irrigable lands, and town lots. It was decided that the proper amount of lands to be allotted was 40 acres of desert land, 5 acres of irrigable lands and two acres of town lots to each Indian.

Typical of the selection certificates is the following:

"Selection for Allotment on Palm
Springs Indian Reservation,
1927.

"This is to certify that Genevieve Pierce St. Marie has selected the S-½ NE-¼ SE-¼ SE-¼ Sec. 22; NW-¼ of Section 22, township No. 4 South, Range No. 4 East, of the San Ber. M., containing 45 acres, more or less, according to Government survey. Stake No. ——. Not valid unless approved by the Secretary of the Interior.

"See Remarks other side this certificate.
"H. E. Wadsworth,
"U. S. Special Allotting Agent."

"Remarks:

"In addition to the parcels described on the front of this certificate an unsurveyed two-acre tract has been selected in the SW-¼ SW-¼ SW-¼ Sec. 14, Tp. 4 South, Range 4 East, which will be scheduled when the necessary surveys have been made.

"H. E. Wadsworth,
"Special U. S. Allotting Agent."

Certification of the allotment schedule of 1927 was made as follows:

"Palm Springs, California,
"May 9, 1927.

"This is to certify that listings of allotment selections for the Indians of Palm Springs (Agua Caliente) Indian Reservation, Calif., began on June 1, 1923, and the same were completed on May 9, 1927; and that it is further certified that the allotments shown hereon were made in accordance with the provisions of the act of Congress of February 8, 1887 (24 Stat.L. 388), as amended by the act of June 25, 1910 (36 Stat.L. 855), and supplemented by the act of March 2, 1917 (39 Stat.L. 969–76).

"H. E. Wadsworth,

"Special Allotting Agent.
"C. L. Ellis,
"Superintendent Mission Indian Agency, California."

Some of the selections have become valuable for use as a winter resort, and as a result of considerable private expenditures. Neither the allotment schedules nor the certificates of selection have been approved by the Secretary of the Interior.

These suits were begun by Indians to whom certificates of selection were made and in some cases by the heirs of a deceased selector. The prayer was for a decree adjudicating that allotments had been made, and that the complainants were entitled to a trust allotment patent. The trial court held that before there could be a valid allotment the Secretary must: (1) determine that the Indians have reached the degree of civilization required by the act; (2) make an order "setting up the mechanics for selection"; and (3) make and approve actual allotments; that no allotment was made; and that if the certificates of selection could be considered as a certificates of allotment the same were not effective because there had been no determination that the Indians in question were sufficiently advanced so as to comply with the act, and the approval of the Secretary was lacking. 24 F.Supp. 237, 240. Findings and decree were made in accordance with the opinion of the trial court. The decree was entered on August 22, 1938, and a motion for rehearing was denied on September 26, 1938.

On December 20, 1938, appellant St. Marie filed a petition for appeal "for herself and for those similarly situated". An order allowing "said appeal" was made on December 20, 1938. There also appears in the record a "Notice of Appeal" dated December 16, 1938, filed December 23, 1938, signed by the attorneys for all complainants, and which names all complainants as the appealing parties. Appellees move to dismiss the appeals of all parties except appellant St. Marie, on the ground that the cases, although consolidated for trial, required separate appeals. It is also pointed out that the cost bond is signed by appellant St. Marie and not by the other appellants.

We think the motion to dismiss should be denied. The Federal Rules of Civil Pro-

cedure, Rule 73, 28 U.S.C.A. following section 723c, governs the manner of appeal after September 16, 1938. Subdivision (a) of that rule provides that an appeal is taken "by filing with the district court a notice of appeal". Subdivision (b) requires the notice of appeal to specify (1) "the parties taking the appeal"; (2) "the judgment or part thereof appealed from"; and (3) the name of "the court to which the appeal is taken". The notice of appeal complies with the rule. While we think it would be better practice to file a notice of appeal in each case, it is apparent that notice of appeal was effectually given, which, after all, is the purpose of the rule. The point concerning the lack of cost bonds is covered by subdivision (a) as follows: "Failure of the appellant to take any of the further steps to secure the review of the judgment appealed from does not affect the validity of the appeal, but is ground only for such remedies as are specified in this rule or, when no remedy is specified, for such action as the appellate court deems appropriate, which may include dismissal of the appeal". We are not asked to take any action with regard to the failure to file cost bonds. We are asked to dismiss the appeals on the ground that separate appeals should have been taken. In this state of the record and in the absence of a showing of disadvantage to the appellees, we see no reason for invoking any remedy.

██ Appellants contend that the selections gave the Indians vested rights in severalty to the land selected, and that thereafter nothing remained to be done by the Secretary of the Interior but the ministerial duty of issuing a trust allotment patent. Compare Lemieux v. United States, 8 Cir., 15 F.2d 518. The contention, of course, is based on the proposition that appellants were given the right to make the selections. The cases relied upon[1] as showing that appellants obtained a vested right, all involve a treaty or statute giving to the Indians the right of selection. Such cases do not, therefore, control here.

There is nothing in the Mission Indian Act which confers upon the Indians the right of selection of allotments. The amendment of that act by the Act of March 2, 1917, Ch. 146, is likewise silent in that respect, as is the Act of June 25, 1910. It is urged, however, that appellants have the right of selection under the General Allotment Act of 1887, as amended. It is argued that no method of allotting was made in the Mission Indian Act, and therefore it must have been intended that the method specified in the General Allotment Act was applicable. The method followed actually was in close compliance with the method specified in the General Allotment Act in that a Special Allotting Agent was appointed, some of the lands were surveyed and classified, and certificates of selection issued. We think, however, that whether or not the General Allotment Act was applicable must be determined by ascertaining what the intent of Congress was in adopting the Mission Indian Act. If the former act is not applicable, then it seems clear that Congress, by not specifying the method of allotment in the Mission Indian Act intended that the Secretary of the Interior might choose such method of allotment as he thought desirable. The mere fact that he followed the procedure specified in another statute fails to show that Congress intended such other statute to be applicable.

There is, we think, no basis for saying that the action of the Secretary of the Interior amounted to an administrative construction of the Mission Indian Act, because the method followed was the most reasonable one. It would be well-nigh impossible for the Secretary to make allotments on a basis of equality, without surveying and classifying the land. Likewise, the preliminary work of allotment could not personally be done by the Secretary, and it was only natural that an agent would be appointed for that purpose. In addition, the Secretary undoubtedly permitted a temporary selection by the Indians, because that method had already been approved in Hy-Yu-Tse-Mil-Kin v. Smith, 194 U.S. 401, 414, 24 S.Ct. 676, 48 L.Ed. 1039.

██ It is also urged that since the Mission Indian Act did not authorize allotment

---

[1] Ladiga v. Roland et al., 2 How. 581, 43 U.S. 581, 11 L.Ed. 387; Hy-Yu-Tse-Mil-Kin v. Smith, 194 U.S. 401, 414, 24 S.Ct. 676, 48 L.Ed. 1039; Ballinger v. United States ex rel. Frost, 216 U.S. 240, 249, 30 S.Ct. 338, 54 L.Ed. 464; Fairbanks v. United States, 223 U.S. 215, 32 S.Ct. 292, 56 L.Ed. 409; Henry Gas Co. v. United States, 8 Cir., 191 F. 132, 136; Thomason v. Wellman & Rhoades, 8 Cir., 206 F. 895, 897; United States v. Dowden, 8 Cir., 220 F. 277. Compare: United States ex rel. Knight v. Lane, 228 U.S. 6, 33 S.Ct. 407, 57 L. Ed. 709.

of irrigable lands, and selections of such lands were actually permitted, the only authority therefor was to be found in the General Allotment Act. We believe that argument to be untenable. Section 3 of the Act of March 2, 1917, "authorized and directed" the Secretary to make the allotments in areas as provided in § 17 of the Act of June 25, 1910, which provision authorized allotment of "agricultural or grazing" land "in such areas as in his opinion may be for their best interest". The authority to allot irrigable lands is specific. Section 3 of the Act of March 2, 1917, however, does not make the entire General Allotment Act applicable to the Mission Indians. Only the provision of the General Allotment Act (Act of June 25, 1910, § 17) specifying the amount or area of "agricultural or grazing" land to be allotted is made applicable to the Mission Indians.

It is further asserted that the certificate of Wadsworth to the allotment schedules of 1927, indicates that the General Allotment Act is applicable. We do not believe that such a statement by a subordinate officer can be said to be indicative of Congressional intent. It amounts to no more than an erroneous opinion, and has not had the official sanction of the Secretary. Had there been official sanction of that interpretation, the question as to the effect to be given administrative interpretation would then be considered. We add that for lack of ambiguity, it is doubted that administrative construction has any weight. United States v. Missouri Pac. R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L. Ed. 322.

Finally, it is urged that the Act of February 14, 1923, Ch. 76, 42 Stat. 1246, 25 U.S.C.A. § 335, makes the General Allotment Act applicable to the Mission Indians. The Act relied on is: "That unless otherwise specifically provided, the provisions of the [General Allotment Act], as amended, be, and they are hereby, extended to all lands heretofore purchased or which may hereafter be purchased by authority of Congress for the use or benefit of any individual Indian or band or trible of Indians."

We think this provision does not have the effect ascribed to it. Prior thereto, the General Allotment Act and its amendments spoke of allotting only lands that were reserved or set apart for the Indians. To prevent any doubt that Congress also intended allotment of lands "purchased" for the Indians, the above act was adopted. It does not refer to or mention the Mission Indian Act, and is merely a part of the General Allotment Act.

Considerable argument is made regarding the power of the Secretary of the Interior to determine when the Indians are sufficiently advanced in civilization to warrant allotments in severalty. The determination of that question, it is true, rested in the discretion of the Secretary by § 4 of the Mission Indian Act. The Act of March 2, 1917, § 3, "authorized and directed" the Secretary "to cause allotments to be made * * * in areas as provided in" § 17 of the Act of June 25, 1910. There are two possible constructions of that provision. It might mean that Congress had made the determination that the Mission Indians were sufficiently advanced in civilization to warrant allotments, and unequivocally "directs" the Secretary to make them. On the other hand, it might mean that the Secretary must still exercise his discretion, but upon its exercise, he is "directed" to make allotments in areas he deemed best. Since this is not a proceeding to compel action by the Secretary, we need not determine which meaning is correct.

Affirmed.

GARRECHT, Circuit Judge (dissenting).

This is an appeal from the holding of the United States District Court for the Southern District of California, Central Division, to the effect that certain selections for allotments made by appellants on the Mission Indian Reservation at Agua Caliente or Palm Springs, California, under the authorization of the Secretary of the Interior, vested no rights in the allottees because the Secretary had not approved these allotments after their selection.

Appellants are duly enrolled and recognized members of the Palm Springs Band of Mission Indians of California.

The eighteen suits involved in these proceedings seek to establish the rights of the several appellants to lands claimed to have been allotted in severalty on the Mission Indian Reservation at Agua Caliente or Palm Springs, California.

These suits are brought under Section 345 of Title 25 U.S.C.A. (31 Stat. 760), the relative portions being as follows: "Actions for allotments. All persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of

land under any law of Congress, or who claim to be so entitled to land under any allotment Act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any Act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper district court of the United States; and said district courts are given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty (and in said suit the parties thereto shall be the claimant as plaintiff and the United States as party defendant); and the judgment or decree of any such court in favor of any claimant to an allotment of land shall have the same effect, when properly certified to the Secretary of the Interior, as if such allotment had been allowed and approved by him, * * *."

In order to provide for the needs of the Mission Indians the Act of January 12, 1891, c. 65, 26 Stat. 712, authorized the creation of a commission to arrange a settlement of the Mission Indians upon reservations. In accordance with the recommendation of the Commission lands were withdrawn from settlement for the Indians. These and other lands were made available for these Indians by Acts of Congress, executive withdrawals, and purchases. Pursuant to the Act, thirty reservations have been set apart and patented in trust.

The pertinent parts of this act are printed in the margin.[1]

After some allotments had been made in accordance with the Act of January 12, 1891, it was considered that this Act did not provide for the most acceptable disposition of the lands. To remedy this, the following provision was inserted in the appropriation Act of March 2, 1917, 39 Stat. 969, 976, which related to the making of allotments on the Mission reservations: "Provided, That *the Secretary of the Interior* be, and he *is hereby,* authorized and *directed to cause allotments to be made to the Indians belonging to and having tribal rights on the Mission Indian reservations in the State of California,* in areas as provided in section seventeen of the Act of

[1] "Sec. 2. That it shall be the duty of said commissioners to select a reservation for each band or village of the Mission Indians residing within said State, which reservation shall include, as far as practicable, the lands and villages which have been in the actual occupation and possession of said Indians, and which shall be sufficient in extent to meet their just requirements, which selection shall be valid when approved by the President and Secretary of the Interior. * * *

"Sec. 3. That the commissioners, upon the completion of their duties, shall report the result to the Secretary of the Interior, who, if no valid objection exists, shall cause a patent to issue for each of the reservations selected by the commission and approved by him in favor of each band or village of Indians occupying any such reservation, which patents shall be of the legal effect, and declare that the United States does and will hold the land thus patented, subject to the provisions of section four of this act, for the period of twenty-five years, in trust, for the sole use and benefit of the band or village to which it is issued, and that at the expiration of said period the United States will convey the same or the remaining portion not previously patented in severalty by patent to said band or village, discharged of said trust, and free of all charge or incumbrance whatsoever. * * *

"Sec. 4. That whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians, out of the land of such reservation, in quantity as follows * * *.

"Sec. 5. That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees, which shall be of the legal effect and declare that the United States does and will hold the land thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the State of California, and that at the expiration of said period the United States will convey the same by patent to the said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever. * * *."

June twenty-fifth, nineteen hundred and ten (Thirty-sixth Statutes at Large, page eight hundred and fifty-nine), instead of as provided in section four of the Act of January twelfth, eighteen hundred and ninety-one (Twenty-sixth Statutes at Large, page seven hundred and thirteen): Provided, That this act shall not affect any allotments heretofore patented to these Indians." [Italics supplied]

The following is taken from the said Act of June 25, 1910, (36 Stat. 859) above referred to:

"Sec. 17. That so much of the Indian appropriation Act for the fiscal year nineteen hundred and ten, approved March third, nineteen hundred and nine, as reads as follows, to wit: 'That the Secretary of the Interior be, and he hereby is, authorized, under the direction of the President, to allot any Indian on the public domain who has not heretofore received an allotment, in such areas as he may deem proper, not to exceed, however, eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian, such allotment to be made and patent therefor issued in accordance with the provisions of the Act of February eighth, eighteen hundred and eighty-seven,' be, and the same is hereby, repealed, and sections one and four of the Act of February twenty-eighth, eighteen hundred and ninety-one (Twenty-sixth Statutes, page seven hundred ninety-four), be, and the same are hereby, amended to read as follows:

" 'Sec. 1. That in all cases where any tribe or band of Indians has been or shall hereafter be located upon any reservation created for their use by treaty stipulation, Act of Congress, or executive order, the President shall be authorized to cause the same or any part thereof to be surveyed or resurveyed whenever in his opinion such reservation or any part thereof may be advantageously utilized for agricultural or grazing purposes by such Indians, and to cause allotment to each Indian located thereon to be made in such areas as in his opinion may be for their best interest not to exceed eighty acres of agricultural or one hundred and sixty acres of grazing land to any one Indian. And whenever it shall appear to the President that lands on any Indian reservation subject to allotment by authority of law have been or may be brought within any irrigation project, he may cause allotments of such irrigable lands to be made to the Indians

entitled thereto in such areas as may be for their best interest not to exceed, however, forty acres to any one Indian, and such irrigable land shall be held to be equal in quantity to twice the number of acres of nonirrigable agricultural land and four times the number of acres of nonirrigable grazing land: Provided, That the remaining area to which any Indian may be entitled under existing law after he shall have received his proportion of irrigable land on the basis of equalization herein established may be allotted to him from nonirrigable agricultural or grazing lands: Provided further, That where a treaty or Act of Congress setting apart such reservation provides for allotments in severalty in quantity greater or less than that herein authorized, the President shall cause allotments on such reservations to be made in quantity as specified in such treaty or Act subject, however, to the basis of equalization between irrigable and nonirrigable lands established herein, but in such cases allotments may be made in quantity as specified in this Act, with the consent of the Indians expressed in such manner as the President in his discretion may require.' " 25 U.S.C.A. § 331.

As having an important bearing on the rights of the appellants in these suits attention is directed to the portion of the above section, as amended, which provides for and regulates allotments of irrigable lands, for which there was no provision in any of the Indian Mission Acts. One must keep in mind that this act is an amendment to the General Allotment Act, which by the Act of March 2, 1917 (39 Stat. 969–976), by name and designation is made applicable to Mission Indian reservations. It must also be noted that these several statutes are coupled by references in the certificate to the 1927 schedule which lists the allotments involved in these suits on file in the Indian office of the Interior Department, which certificate states in part, "it is further certified that the allotments shown hereon were made in accordance with the provisions of the act of Congress of February 8, 1887 (24 Stat. L. 388), as amended by the act of June 25, 1910 (36 Stat.L. 855), and supplemented by the act of March 2, 1917 (39 Stat.L. 969, 976)."

Another act which has an important bearing is that of February 14, 1923, c. 76, 42 Stat. 1246, 25 U.S.C.A. § 335, which, omitting the enacting clause, is as follows: "That unless otherwise specifically provided, the provisions of the Act of Febru-

ary 8, 1887, [sections 331 to 334, inclusive, and 336, 341, 348 to 350, inclusive, and 381] [The General Allotment Act] as amended, be, and they are hereby, extended to all lands heretofore purchased or which may hereafter be purchased by authority of Congress for the use or benefit of any individual Indian or band or tribe of Indians."

Pursuant to this legislation the Secretary of the Interior on June 7, 1921, appointed one Harry E. Wadsworth as Special United States Allotting Agent at Large for the Mission Indian Reservations of California. Said appointment became effective July 21, 1921, on which date said Wadsworth accepted and qualified for said position.

Said allotting agent was authorized to survey and classify the land of various Mission Indian reservations including those of the Agua Caliente or Palm Springs Reservation of the Mission Indian Reservations of California, to prepare allotment schedules for the Palm Springs Band of Mission Indians, and to issue certificates of selection.

In accordance with his instruction said agent proceeded with the work of listing allotment selections and surveying and classifying the lands. In the year 1923 he prepared an allotment schedule and in 1925 filed with the Bureau of Indian Affairs the schedule showing allotment selections made in 1923 for fifty members of the Palm Springs Band of Mission Indians, which probably included all of the members of said band. The Secretary of the Interior did not approve of these allotment selections as shown on said schedule because many of them were not voluntary selections, and it was thought that these allotments should be made only to those Indians who voluntarily made selections.

Thereupon, and pursuant to instructions from the Secretary of the Interior, Wadsworth prepared a new schedule which listed only selections voluntarily made, and in 1927 he filed with the Bureau of Indian Affairs this new schedule showing selections for twenty-four members of the Palm Springs Band of Mission Indians.

To the 1927 schedules Wadsworth appended the following certificate:

"Palm Springs, California,
"May 9, 1927.

"This is to certify that listing of allotment selections for the Indians of Palm Springs (Agua Caliente) Indian Reservation, Calif., began on June 1, 1923, and the same were completed on May 9, 1927; and that it is further certified that the allotments shown hereon were made in accordance with the provisions of the act of Congress of February 8, 1887 (24 Stat.L. 388), as amended by the act of June 25, 1910 (36 Stat.L. 855), and supplemented by the act of March 2, 1917 (39 Stat.L. 969-76).

"H. E. Wadsworth,
"Special Allotting Agent.
"C. L. Ellis,
"Superintendent Mission Indian Agency, California."

Certificates for selection were issued to those listed on the schedules. Typical of the certificates is that issued in 1927 to Genevieve P. St. Marie, which reads:

"Selection for Allotment on Palm Springs Indian Reservation, 1927.

"This is to certify that Genevieve Pierce St. Marie has selected the S ½ NE ¼ SE ¼ SE ¼ Sec. 22; NW ¼ NE ¼ of Section 22, township No. 4 South, Range No. 4 East, of the San Ber. M., containing 45 acres, more or less, according to Government survey. Stake No. ———. Not valid unless approved by the Secretary of the Interior.

"See Remarks other side this certificate.
"H. E. Wadsworth,
"U. S. Special Allotting Agent."

"Remarks:

"In addition to the parcels described on the front of this certificate an unsurveyed two-acre tract has been selected in the SW ¼ SW ¼ SW ¼ Sec. 14, Tp. 4 South, Range 4 East, which will be scheduled when the necessary surveys have been made.

"H. E. Wadsworth,
"Special U. S. Allotting Agent."

H. E. Wadsworth, the allotting agent, a witness in describing the manner and method which the department followed in making these allotments, testified in part as follows:

"You may describe the reservation as consisting of desert lands, irrigation lands and the town lands, or lots. The survey of them was made in detail by an engineer from the General Land Office at Washington on the request of the Commissioner of Indian Affairs, and based on my request that the lands be surveyed, and an allot-

ment schedule was worked out in connection with the irrigation service, and the surveys were made based upon that scheme by the representatives of the General Land Office. We found that the best agricultural lands would permit only an allotment of five acres each per capita to those entitled to allotments. The lands in Section Fourteen adjoining the townsite of Palm Springs, which were the most valuable town lot sites, were found to be nearly exhausted. Those lands were allotted in the amount of two acres each. The grazing lands—the desert lands which were uncultivated and not susceptible of irrigation for which no water had been provided—were allotted in forty acre tracts.

\* \* \* \* \* \* \*

"In making the selections of town lots, I took into consideration the rights of the then inhabitants of such lots. I did not always allot the town lots to those claiming them, but did so when those lots were the then homes of those claiming them. Our plan was to protect the rights of each individual Indian as far as possible, and to give him the land he claimed as his home, or any other lands in addition that he could have in the neighboring lands which he claimed, including forty acres, so that when they received the total allotment it would amount to Forty Seven Acres of land.

" \* \* \* The lands which they selected at that time were the lands which I scheduled for and allotted to them at that time. In other words, the lands described in each case upon the schedule are the lands they selected at that time, because the sheets I issued were the certificates of selection, and no objections were made of any error at that time. \* \* \*

\* \* \* \* \* \* \*

" \* \* \* I made notations that when those lands were surveyed that a particular allottee had selected it. \* \* \*.

\* \* \* \* \* \* \*

" \* \* \* the main part of the work of making allotments was not to do with surveyed lands alone. We worked out this whole scheme, the policy as a whole, so many acres to each individual in Section 14, that being the most valuable land, and in the irrigation section, 5 acres each, and 40 acres in desert lands. I had questioned the Indian Department as to whether they would make it 47 acres to each allottee, and we worked out the whole scheme so

that it would work together, you know, in such fashion as to give each Indian his share of the best, next best and least desirable lands.

"In some of the cases of allotments at Palm Springs there were contests, various people claiming the same land. \* \* \*.
\* \* \* \* \* \* \*

" \* \* \* In settling disputes and adverse claims I heard what everybody had to say in reference to them that knew or had any interest in them and made up my mind as to who was entitled the allotment and gave it to such person.
\* \* \* \* \* \* \*

"Now, referring to the tract in question described in St. Marie's certificates, and referring to Government's Exhibit "A", and to those lots marked 64, and 65, in Section 14, they were not surveyed when the certificates of selection and schedule was [sic] made up. So, an endorsement was made on the certificates that when they were surveyed, which has since been done, they could be allotted. She wanted those two corner lots, or the corner and the one next to it. They were not surveyed, but carrying out the work of marking, we guessed them to be numbered as they appear to have been since. She wished to go on record as having them when they were surveyed.

"At that time lot 61 was surveyed, and a line surveyed from Indian Avenue back to the rear of lot 61. The road along there was a section line and, of course, surveyed. All that was needed to complete the survey and close the lots would be to run one line across one side of them. The land was capable of being easily identified. You could foretell the lot numbers by following the plan and marking them off, you know, in the positions where those lots were sure to come when they were finally surveyed."

At the time the Mission Indian Commission selected these lands for the Mission Indians they were not of great value. The Commission in its report to the President, of date December 7, 1891, among other things stated:

"The odd sections are claimed by the railroad company, many of the even sections are dreary wastes of Colorado Desert Lands, and many others are rocky, pathless mountain lands. Nearly all of the Indians are settled on Section fourteen (14) in Township four (4) South, Range four (4) East, S. B. M. This is excellent land, and if it had an abundant permanent wa-

ter supply, no better land could be found in Southern California, for a home. The hot spring is near the West line of this Section, and is used not only for bathing purposes, but the overflow is used for irrigation. The quantity of water, however, is small, and the Indians have depended largely upon water from Toquitch Canyon.

\* \* \* \* \* \* \*

"As we have before suggested, there is a valuable hot spring on Section fourteen (14), in Township four (4) South, Range four (4) East. Just across the street, Dr. Murray and wife have a small hotel that is used as a health resort. This is seven miles across the dreary desert from a small station on the Southern Pacific Railroad, called Seven Palms. There are no people living there but the station employees; it is about twenty or twenty-five miles to Banning, the first village of any importance. Dr. Murray and wife have had a three year lease of this spring, for which they have paid $500. The Indians are allowed to bathe at reasonable hours. We do not believe the Murrays have realized one-half the rent they have paid from the baths."

In Section 14, which is the section immediately adjoining Palm Springs, these Indians were given what is known as a townsite lot of two acres each. In addition they were given irrigated land to the amount of five acres each and forty acres of desert property.

All of these Palm Springs Indians were given the opportunity to select that property on which they and their parents or ancestors had lived for years. Some of the Indians did not wish to accept or take allotments at the time the allotments were being made. Other of the Indians made their selections and accepted their allotments and built them up and in some cases spent thousands of dollars improving them. That they were encouraged to do this by the Indian Department is evident from the record.

On October 26, 1923, Wadsworth, the special allotting agent, asked for instructions from the Indian Department in this matter in a message to that office, the pertinent part of which was as follows:

"Allotments being completed and certificates issued. Many allottees anxious to immediately occupy their selections and prepare things for early crops instead waiting for receipt of patents. This is fine for preparing ground and planting.

Request telegraphic instructions as to what advice be given allottees in this and similar cases."

On the same day he received this reply:

"Your telegram twenty-sixth. No objection to Indians preparing their respective allotment selections for crops if properly listed on schedule."

Further, at a later time one of the allottees received the following communication:

"Department of the Interior,
United States Indian Field Service,
Coachella, Calif., April 22, 1927.

"Miss Anna J. Pierce,
Palm Springs, Calif.

"Friend Anna: I enclose to you herewith certificate covering the allotments just made to you on the Palm Springs Reservation. As I have done in Carrie's case, I included the 40-acre tract in the SE ¼ of the SW ¼ of sec. 10 although it is not yet surveyed, as I think I explained to you yesterday. I am hoping, however, that I shall have another surveying crew at work this summer or fall, and believe we can at that time come down and make these surveys.

"I omitted to say in my note of today transmitting Carrie's certificate to her, that it is difficult to tell exactly when you may expect these patents from Washington but I believe they should be here within 6 weeks or so. They will come to the superintendent in Riverside, who will notify you that they are there and ready for delivery to you. In the meantime, the Commissioner of Indian Affairs in Washington authorizes me to say to you that from this date you are entitled to enter upon and take possession of these allotments, and these certificates will be your evidence of such authority until the trust patents are received by you.

"I feel certain that these lands will continue to increase in value and will serve as the beginning of a very comfortable competency for each one of you.

"With regards and best wishes, I am,
"Your friend,
"(Signed) H. E. Wadsworth,
"United States Special Allotting Agent."

At the time these lands were reserved as reservations, as the report shows, the nearest town of Banning was many miles away.

When the allotments were selected, classified, scheduled, and certified, the town of Palm Springs was a small unincorpora-

ted community, visited by those who were attracted by the climate and the charm of the desert. Probably, the most important attraction was the hot springs located in Section 14.

Later the fame of Palm Springs became world wide as a town of millionaires and film actors. Luxurious hotels, two costing $1,000,000 each, expensive apartments and homes have been erected; stores and shops established. In all this the Indians had little part. Some of these lands adjacent to the very prosperous community center are rented by some of the Indian allottees to white persons, mostly laborers, and the poorer class of tourists. This does not meet with the approbation of the more opulent residents of the town who have been active in the effort that has been going on for several years to have the Congress repeal the statute requiring the Secretary of the Interior to allot the lands and to have other statutes enacted authorizing the sale of these Indian lands. The Indian allottees, appellants here, who have selected these allotments refuse to sell their lands and are opposed to this scheme, and the Department now refuses to issue them these trust patents as the statute directs. (See Hearings, S. Committee on Indian Affairs, S. 1424 and 2589, 75th Cong., 1st Sess., cited in appellees' brief.)

Many, if not all, of the appellants were born on the lands embraced in the reservation; some of them upon the very parcels selected as their allotments. Obviously, then, the only thing that can defeat their right to these allotments under the statute would be that they are not sufficiently advanced in civilization. Yet any such lack is nowhere suggested. Indeed, the contrary is quite apparent from the record.

Mr. Wadsworth, the allotting agent, made allotments to about 1,000 of the Mission Indians in California. These were all approved by the Secretary of the Interior with the exception of those involved in this appeal. The reason assigned as an excuse for treating appellants differently from the other Mission Indians is that their allotments have now become very valuable.

The District Court held, and appellee argues here, that under the original Mission Indian Reservation Act the Secretary of the Interior could not, under any circumstances, be required to approve these allotments, even where selected by the Indians upon the Secretary's direction and scheduled and certified to them by his own agent; in other words, that the court is powerless to compel action. Such a construction would all but nullify the act.

The allotting agent was directed by the Department to proceed to the reservation and cooperate with these certain Indians living thereon who claimed rights to allotments; and then and there these Indians with the consent, approval and assistance of this allotting agent made their selections for allotments, which were duly designated in certificates issued by the agent to the claimants. Thereupon these lands were scheduled by him as having been allotted to these Indians, and the schedules, with certificate of authenticity attached thereto, were transmitted to the Department. No objection having ever been made as to the qualifications of these Indians, it must be held that these proceedings unmistakably indicate that the Secretary of the Interior was of the opinion that these Indians were "so advanced in civilization as to be capable of owning and managing the land in severalty." Indeed, it is nowhere asserted that the allottees did not meet this requirement.

Appellants contend that all the requirements of law to vest in each of them in severalty the right to the allotment selected by them or for them by an ancestor have been complied with; that such selections were dated, scheduled, and certified by the duly appointed allotting agent and by him transmitted to the office of the Secretary for his approval; and that the Secretary is without authority or right to withhold such approval.

The Government places its reliance upon that part of Section 5 of the original Mission Indian Act of January 12, 1891, c. 65, 26 Stat. 712, which reads as follows: "That upon the approval of the allotments provided for in the preceding section by the Secretary of the Interior he shall cause patents to issue therefor in the name of the allottees."

The contention, in effect, is that this reposes in the Secretary such discretion that he can withhold approval for any reason, or no reason. This claim seems at variance with the intent of Congress in framing the laws for the benefit of these Indians.

The purpose of Congress in enacting measures "for the relief of the Mission Indians in the State of California" was to have a commission arrange a just and satisfactory settlement of the Indians upon res-

ervations which were to be secured to them. These reservations were to include, so far as practicable, the lands and villages which had been in actual occupation and possession of said Indians. Upon the completion of the work of the commissioners the Secretary of the Interior was to issue a patent for each reservation selected in favor of each band, declaring that he would hold the land in trust for certain purposes, the principal one being: "That whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians, out of the land of such reservation, * * *."

Thus, the very purpose of the law was to allot the lands to the Indians in severalty.

The decision of the District Court and the argument of the appellee here to sustain it rests altogether upon the assumption that Section 5 of the original Mission Indian Act of January 12, 1891, c. 65, 26 Stat. 712, is alone applicable to the situation here, and it is insisted that this section leaves it altogether to the mere option, perhaps even the caprice, of the Secretary of the Interior as to whether or not he will approve allotments made under Section 4 of the Act. This opinion has already negatived this contention, but there is still another factor which strengthens the position of appellants who point out that the original Mission Indian Act was amended by the Act of March 2, 1917, c. 146, 39 Stat. 969, 976, which Act provides: "That the Secretary of the Interior be, and he is hereby, authorized and directed to cause allotments to be made to the Indians belonging to and having tribal rights on the Mission Indian reservations in the State of California, in areas as provided * * *."

Here is not only authorization to the Secretary to make allotments, but the language suggests that he is directed to do so. At least the thought is emphasized that the Secretary must cause allotments to be made, which, after all, is the purpose of all these statutes. Moreover, the very certificates upon the schedules of these allotments filed in the office of the Secretary of the Interior refer to this amendatory act as one of the statutes complied with in the listing of these allotments.

The argument that this amendment to the Mission Indian Act was intended to apply only in determining the size of the allotments to be made is not persuasive. The Act contains other provisions in which the method to be followed in allotting irrigated lands is outlined, for which there is no procedure indicated in any Mission Indian act. This procedure is first set out in the Act of June 25, 1910 (36 Stat. 855, 860), which modifies the Act of February 28, 1891 (26 Stat. 794), which, in turn, was an amendment to the General Allotment Act and which was by its terms made applicable to the Mission Indian reservations.

Furthermore, there are no provisions in the Mission Indian Act for an allotting agent to make allotments or for any survey or classification of lands. This procedure is all supplied by the General Allotment Act and the various amendments thereof. With respect to those particulars there was no other statute to guide the allotting agent in what he did. To avoid the binding effect given by court opinions to allotments initiated under that enactment all these omissions of method and procedure from the Mission Indian Act, concerning these very important matters, are lightly waved aside by the majority opinion, and no significance is attached to the admitted fact that the Secretary of the Interior complied with the procedure indicated in the General Allotment Act, which fact is also attested in the certificate accompanying the schedules. That the allotting agent in his schedule certificate declared that he was following that act, it is asserted, is not sufficient to show that Congress intended such statute to be applicable here; but if we remind ourselves that some of the Mission Indian lands were purchased for these Indians by the Government, we then realize that the Congress by the Act of February 14, 1923, c. 76, 42 Stat. 1246, 25 U.S.C.A. § 335, extended the provisions of the General Allotment Act "to all lands heretofore purchased or which may hereafter be purchased by authority of Congress for the use or benefit of any individual Indian or band or tribe of Indians," thus making the General Allotment Act applicable to Mission Indian lands.

The majority opinion in concluding that the Act of February 14, 1923, does not have the effect ascribed to it disposes of its pertinency in a summary way that is altogether unconvincing. It concedes that the purpose of this act was to enlarge the scope:

of the General Allotment Act to make it cover lands purchased, as well as those reserved or set apart, for the use or benefit of any individual Indian or band or tribe of Indians. The opinion then proceeds to limit the broad language used in the statute by maintaining that it must be restricted and held not to include the Mission Indian Act because that enactment is not particularly mentioned. Were this correct, the act would have no application to any lands purchased by the authority of Congress for any "individual Indians or band or tribe of Indians" described in any reservation act because none is particularly mentioned.

In considering the purpose and relevancy of this Act of February 14, 1923, it is well to keep in mind, as the majority opinion points out, that any method of allotment suggested in the Mission Indian Act is so wanting in substance or form that the allotting officer had to borrow method and procedure from the General Allotment Act. It requires no imagination to conclude that Congress, from what it said and the purpose sought to be accomplished by this remedial Act of February 14, 1923, intended to supply the remedy for just such omissions in the several, separate Indian acts by making pertinent provisions of the General Allotment Act applicable where circumstances required. And in this case the allotting agent of the Department of the Interior, in following the procedure of the General Allotment Act, was giving effect to such reasonable intention.

The argument of inclusion or exclusion presented in the majority opinion, based on the fact that because the Mission Indian Act was not referred to by name in this Act of February 14, 1923, therefore the Mission Indians were excluded from the benefits, brings to the fore and suggests a counter proposition of greater merit. The original General Allotment Act excepted from its provisions by name the reservations of many tribes and the lands of many Indians. Neither in this Act or in any subsequent amendment to the General Allotment Act is there any exception therefrom of the Mission Indian reservations. It is, therefore, far more reasonable to hold that, not being excluded, they are included than to follow the erroneous interpretation suggested by the majority opinion.

The Government in its brief points to certain portions of the General Allotment Act and the Mission Indian Act, asserting that they are in conflict as follows: "On the one hand, in the General Allotment Act, Congress directed that allotments should be made to individual Indians once the President caused any particular reservation to be surveyed and open to allotment. It did not give the Secretary of the Interior a discretion to determine whether allotments should be made. On the other hand, in Section 4 of the Mission Indian Act, discretion was given to the Secretary of the Interior to make allotments, if in his judgment any of the Indians had capacities to own and manage land in severalty."

These statements do not give a correct interpretation to these Acts; the General Allotment Act did not in exact language direct the President to make allotments. The wording is: " * * * the President of the United States be, and he hereby is, authorized, whenever in his opinion any reservation or any part thereof of such Indians is advantageous for agricultural and grazing purposes, to cause said reservation, or any part thereof, to be surveyed, or resurveyed if necessary, and to allot the lands in said reservation in severalty to any Indian located thereon in quantities as follows: * * *." 24 Stat. 388.

The Act of March 2, 1917, c. 146, 39 Stat. 969, 976, which was in effect prior to the making of the allotments in the cases here, in its directions to the Secretary of the Interior made use of the more mandatory language: "Provided, That the Secretary of the Interior be, *and he is hereby, authorized and directed to cause allotments to be made to the Indians belonging to and having tribal rights on the Mission Indian reservations of the State of California* * * *." [Italics supplied.]

As the President in causing allotments to be made would act through the Secretary of the Interior, there is no apparent conflict or inconsistency.

That the Interior Department at the time these allotments were being made in May, 1927, did not consider these various acts of Congress inconsistent is evident from the certificates upon the schedules of allotment, wherein it is stated that the allotments "were made in accordance with the provisions of the Act of Congress of February 8, 1887 (24 Stat.L. 388) [which is the General Allotment Act], as amended by the Act of June 25, 1910 (36 Stat.L. 855), and supplemented by the Act of March 2, 1917 (39 Stat.L. 969–76)."

While expressions of opinion of officials charged with the executions of the laws under consideration are not binding on the courts, the constructions placed upon them by these departmental officers are sometimes considered persuasive. In this connection, besides keeping before us the official conduct of those who had charge of making these allotments in the Interior Department, it must not be overlooked that both that Department and the Attorney General's office had under consideration the validity of the allotments in these cases. In a communication from the office of the Secretary of the Interior to the Attorney General, signed by the Assistant Secretary, we find this significant paragraph: "As to the allotment feature of the situation, we are confronted with the provision in the act of March 2, 1917 (39 Stat. 976), amending section 3 of the act of January 12, 1891 (26 Stat. 712), so as to direct the Secretary of the Interior to make allotments to the Indians of the Mission Reservations in California in areas as provided in section 17 of the act of June 25, 1910 (36 Stat. 859), rather than as provided in section 4 of the act of January 12, 1891, supra; in other words, usually regarded as mandatory rather than discretionary legislation."

In a message from the Assistant Attorney General transmitting a copy of this letter to the United States Attorney at Los Angeles we find this comment:

" * * * Moreover, in view of the present status of the law on the subject, it is not quite certain whether the Government could successfully resist the action of these or any other individual members of the tribe for allotments within said reservation.

"Under the circumstances we must reply [sic] upon your judgment and discretion to take such action as may be necessary to hold the matter in abeyance until Congress has had an opportunity to consider the situation. In this connection your attention is called to the fact that the present action may be defeated upon motion to dismiss on the ground of misjoinder of causes of action and parties defendants."

The Government conceded that where the General Allotment Act is applicable and a grant is shown, it would be true that the certificates of selections would be conclusive evidence of rights to allotments which may not be nullified by arbitrary action of the Secretary of the Interior. It is also conceded in such circumstances that the selection of an allotment is the inception of an equitable title and, in cases where heirship has been properly established, that heirs are entitled to succeed to such equitable rights to an allotment as may have been vested in their ancestors. However, it is contended that the General Allotment Act is not applicable and that decisions based thereon are not persuasive here because the basic premise of legislative grant by Congress of rights in severalty is negatived by decisions in such cases as Levey v. Stockslager, United States v. Stockslager, 129 U.S. 470, 9 S.Ct. 382, 32 L.Ed. 785; LaRoque v. United States, 239 U.S. 62, 36 S.Ct. 22, 60 L.Ed. 147; United States v. Chase, 245 U.S. 89, 38 S.Ct. 24, 62 L.Ed. 168; Chase, Jr. v. United States, 256 U.S. 1, 41 S.Ct. 417, 65 L.Ed. 801. The conclusive answer is, as we have tried to show, that Congress has made the General Allotment Act applicable, but in any event, the cases cited present different fact situations from the cases here before us. In the Levey case [129 U.S. 470, 9 S.Ct. 384, 32 L.Ed. 785] "no certificates were prepared for issue; no step was taken by the commissioner of the general land-office towards issuing them; no new lands were selected or located; and the whole thing remained in fieri and subject to the control of congress." In the LaRoque case the Nelson Act was under consideration; the facts were not in dispute. LaRoque, in whose name the patent was issued, was a Chippewa Indian, whose name was included in the census of Indians made under the Nelson Act. Had he lived, he would have been entitled to take an allotment under the Act, but he died in infancy without an allotment being selected by or for him. Thereafter, application in his name for the allotment in question was presented to the allotting officers, and upon this application the allotment was made and the trust patent issued, both in his name, as if the selection had been made while he was living. It was decided that under the terms of the Act selections of allotments might only be made on the part of living Indians acting for themselves or through their designated representatives, that therefore no rights had been acquired by LaRoque, and that the claim was void.

These two cases just discussed and others of similar purport, like Woodbury v. United States, 8 Cir., 170 F. 302, support the proposition that until the selection of the

allotment is made, the right thereto is a mere float that does not attach to any particular piece of land.

In the case of Chase, Jr., no authority was shown which made him an allottee. The act under which he claimed to be entitled to an allotment in severalty was passed March 3, 1893 (c. 209, 27 Stat. 630). Chase was not born until after this act was passed. The Government successfully contended that an act passed May 11, 1912, c. 121, 37 Stat. 111, repealed the Act of 1893 and thereby cut off any right of Chase to an allotment. The decision was rested largely on the case of United States v. Chase, 245 U.S. 89, 38 S.Ct. 24, 25, 62 L. Ed. 168, which concerned a controversy between two Omaha Indians over the use and occupancy of forty acres of land within the Omaha Indian Reservation and involved the construction of the treaty with the tribe. It was held that under the situation there presented the provisions of the treaty indicated a purpose to apportion to the Indians possessory rights only and did no "more than to individualize the existing tribal right of occupancy"; that the treaty let the fee remain in the United States and left the United States and the tribe free to take such measures for the ultimate and permanent disposal of the land, including the fee, as might become essential or appropriate. Under such facts the assignment of the claimed rights furnished no substantial basis for thinking that the assignee would ever have a right to the fee, and there was no present vested right as in the cases here.

Under the Act for the relief of the Mission Indians in the State of California the commissioners appointed were to select a reservation for each band or village. One such reservation was set aside for the Palm Springs or Agua Caliente Band. This selection was approved by the President and Secretary of the Interior. In further compliance with the Act, a trust patent was issued in favor of the band, declaring that the United States would hold the land thus patented subject to the provisions of Section 4 of the Act, which section provided that whenever any of the Indians residing upon any reservation patented under the provisions of this act shall, in the opinion of the Secretary of the Interior, be so advanced in civilization as to be capable of owning and managing land in severalty, the Secretary of the Interior may cause allotments to be made to such Indians. The evidence in this case shows that all these requirements of the Act have been complied with; thereupon, under the Act, the Secretary of the Interior was required to issue patents in the name of the allottees.

This act accorded to these Indians from its enactment a community right to the lands of the reservations established thereunder, and the patents to the tribes in trust, issued in pursuance of the Act, divested the Government of title to such of the lands as were thereafter selected by qualified allottees in compliance with Section 4. Upon such selection by the Indians, followed by the notation of such upon a proper schedule and the filing of the same in the office of the Secretary, they, the Indians, acquired a vested interest of which they could not be divested by the failure of the Secretary of the Interior to carry out the law. Smith v. Bonifer, C.C., 154 F. 883, 887.

Subsequent to the making of the allotments here involved, the Department of the Interior on July 31, 1929, in the case of Raymond Bear Hill, 52 L.D. 688, in determining the right of that Indian allottee, on page 690 had this to say:

" * * * it may be said generally that it is well settled that a claimant to public land who has done all that is required under the law to perfect his claim, acquires a right against the Government and that his right to a legal title is to be determined as of that time. This rule is based on the theory that by virtue of his compliance with the requirements, he has an equitable title to the land; that in equity it is his and the Government holds it in trust for him, although no legal title passes until patent issues. Wyoming v. United States (255 U.S. 489 [41 S.Ct. 393, 65 L.Ed. 742]); Payne v. New Mexico (255 U.S. 367 [41 S.Ct. 333, 65 L.Ed. 680]); Payne v. Central Pacific Railway Company (255 U.S. 228 [41 S.Ct. 314, 65 L.Ed. 598]). It would seem to follow that what is true concerning the equitable rights of an entryman to public land is also true as to the equitable rights of a qualified Indian to an allotment of tribal or reservation land. In fact, the position of a qualified Indian is stronger than that of an entryman of public land, for the reason that he has an inherent interest in the common property of his tribe.

"The filing and recording of an allotment selection by a qualified Indian in the field, operates to segregate the land from other disposal. It gives him a prior or preference right to the land as an allotment which, upon approval by the department, vests in

him an equitable right to a patent. By the filing and recording of the Indian selection, the land is necessarily withdrawn from the mass of tribal lands, and the right of the Indian becomes in its nature individual property. * * * Under any other view than that expressed, the position would be that land taken by an Indian in allotment does not become 'disposed of' or segregated from tribal status until issuance of final or fee patent, which could not have been the intention of the law, especially in view of numerous departmental and court decisions to the contrary. The rule applicable in this matter is the same as that applying to any qualified person who performs all conditions prescribed by law to secure entry of lands open thereto—the law considers that as done and virtually views the entry made. Hy-Yu-Tse-Mil-Kin v. Smith (194 U.S. 401 [24 S.Ct. 676, 48 L.Ed. 1039])."

The case of Lemieux v. United States, 8 Cir., 15 F.2d 518, 523, is cited to uphold the contention that no vested rights accrue to an allottee by reason of the mere application or selection of an allotment. Aside from the important fact that in the case at bar the map and schedule of allotments as filed by the allotting agent in the office of the Secretary of the Interior specifically indicate the allotments, giving in addition their description, there are other distinguishing features which might be pointed out. Lemieux was not an Indian located upon the reservation. The selection of the land by Lemieux was not reported to the Secretary of the Interior and the land had never been set apart for him, but on the contrary this same land was selected by another Indian, which selection had been reported to and approved by the Secretary of the Interior and a patent had been issued to him therefor. Lemieux, more than thirty-five years after he had made his alleged selection and twenty-seven years after the land had been allotted to the other Indian, brought his action. On these facts the court in its opinion concluded, "There is nothing about his [Lemieux's] claim, after the lapse of a period of some 35 years, which appeals to a court of equity."

Some allusion is made to the circumstance that the certificates of allotment contain the sentence: "Not valid unless approved by the Secretary of the Interior." The law does not require this form; at most it implies only what the language of the statute imports—that the Secretary could with-

hold a patent for some legal cause, such as, if the allottee was not a qualified member of the particular tribe or band of Indians or if some other similar requirement of the statute was not fulfilled. But here no such claim of disability is being urged or even suggested.

With the holding of the majority that all the formal steps that were taken in compliance with this Act of Congress amounted to nothing, that not even the vestige of an equitable estate in the allottees resulted therefrom, I am unable to agree.

The Law Does Not Authorize the Secretary of the Interior to Withhold a Patent from a Qualified Allottee Who Has Established a Vested Equitable Title.

The action taken by the Department of the Interior and the procedure followed in the selection, surveying, scheduling, and certifying of these allotments was the inception of an equitable interest which vested in the qualified Indian claimants and of which they cannot now be deprived by the failure of the Secretary to act. Some consideration of the historical background of this legislation will be helpful. Helen Hunt Jackson, whose romantic story "Ramona" so poignantly portrayed the pitiable plight of the Mission Indians of California as to arouse the nation and stir Congress to action, was a member of the Commission appointed by the Government to make an investigation into the condition of these Indians and to make recommendations of measures to be adapted for their protection and relief.

The Indian Mission Act substantially embodies the recommendations of this Commission, whose report dated July 13, 1884, was made a part of the Senate Committee's report recommending the passage of the law. (Senate Report No. 74, 50th Congress, First Session)

The report of this Mission Indian Commission is most interesting throughout and contains many paragraphs which reveal the violations of the fundamental rights and equities of these Indians with such compelling force that the Senate Committee was moved to begin its recommendation of the passage of the Mission Indian Act in these words: "The history of the Mission Indians for a century may be written in four words: conversion, civilization, neglect, outrage. The conversion and civilization were the work of the mission fathers pre-

vious to our acquisition of California; the neglect and outrage have been mainly our own. Justice and humanity alike demand the immediate action of the Government to preserve for their occupation the fragments of land not already taken from them."

This report of the Senate Committee, the report of the Commission, and the Act itself show that the definite purpose of the enactment was to vest complete title to the homes to which these natives had so tenaciously clung through hardship and heartbreak by making their occupation immediately secure by providing for the issuance of trust patents to the various tribes or villages for the reservations set aside to each band with the explicit provision that later the title in fee, free of any trust should be transferred by final patent to the respective Indian allottee.

The following are excerpts from the report of the Mission Indian Commission and of the legal opinion attached thereto:

"The term 'Mission Indians' dates back over one hundred years, to the time of the Franciscan missions in California.

\*       \*       \*       \*       \*

"\*   \*   \*   Travelers in southern California \*   \*   \* would be greatly surprised at the sight of some of the Indian villages in the mountain valleys, where, freer from the contaminating influence of the white race, are industrious, peaceable communities, cultivating ground, keeping stock, carrying on their own simple manufactures of pottery, mats, baskets, etc., and making their living—a very poor living, it is true, but they are independent and self-respecting in it, and ask nothing at the hands of the United States Government now, except that it will protect them in the ownership of their lands—lands which, in many instances, have been in continuous occupation and cultivation by their ancestors for over one hundred years.

"From tract after tract of such lands they have been driven out, year by year, by the white settlers of the country, until they can retreat no farther; some of their villages being literally in the last tillable spot on the desert's edge or in mountain fastnesses. Yet there are in southern California to-day many fertile valleys, which only thirty years ago were like garden spots with these same Indians' wheat fields, orchards, and vineyards.' Now there is left in these valleys no trace of the Indians' occupation, except the ruins of their adobe houses; in some

instances these houses, still standing, are occupied by the robber whites who drove them out.

\*   ·   \*       \*       \*       \*

"\*   \*   \* It is certain that in the case of all these Mission Indians the rights involved are quite different from and superior to the mere 'occupancy' rights of the wild and uncivilized Indian.

"At the time of the surrender of California to the United States these Mission Indians had been for over seventy years the subjects, first of the Spanish Government, secondly of the Mexican. They came under the jurisdiction of the United States by treaty provisions, the treaty of Guadalupe Hidalgo, between the United States and Mexico, in 1848. At this time they were so far civilized that they had become the chief dependence of the Mexican and white settlers for all service indoors and out. In the admirable report upon these Indians made to the Interior Department in 1853 by the Hon. B. D. Wilson, of Los Angeles, are the following statements:

"'These same Indians had built all the houses in the country, planted all the fields and vineyards. Under the Missions there were masons, carpenters, plasterers, soapmakers, tanners, shoemakers, blacksmiths, millers, bakers, cooks, brickmakers, carters and cart-makers, weavers and spinners, saddlers, shepherds, agriculturists, horticulturists, vineros, vaqueros—in a word, they filled all the laborious occupations known to civilized society.'

"The intentions of the Mexican Government towards these Indians were wise and humane. At this distance of time, and in face of the melancholy facts of the Indians' subsequent history, it is painful to go over the details of the plans devised one short half century ago for their benefit. \*   \*   \*

\*   ·   \*       \*       \*       \*

"The first and most essential step, without which there is no possibility of protecting these Indians or doing anything intelligently for them, is the determining, resurveying, rounding out, and distinctly marking their reservations already existing. The only way of having this done accurately and honestly is to have it done by a surveyor who is under the orders and constant supervision of an intelligent and honest commissioner; not by an independent surveyor, one who runs or 'floats' reservation lines where he and his friends or in-

terested parties choose, instead of where the purpose of the United States Government, looking to the Indians' interests, had intended. * * *

"The reservation lines, when thus defined, should be marked plainly and conspicuously by monuments and stakes, leaving no room for doubt. A plat of each reservation should then be given to the Indians living on it. It was pathetic, in our visits to village after village, to hear the Indians' request reiterated for this thing—'a paper to show to the white men where their lands were.' * * *

\* \* \* \* \*

"All white settlers now on reservations should be removed. For the last four years stray settlers have been going in upon reservation tracts. This is owing to the lack of boundary definitions and marks as aforesaid, also to the failure of the surveys to locate the reservations so as to take in all the ground actually occupied by Indian villages. Thus, in many instances, the Indians' fields and settlements have been wrested from them, and they in their turn have not known where they could or could not go. * * *

\* \* \* \* \*

"* * * all these Indians' reservations, those already set off by Executive order, and all new ones made for them, whether of Government lands now in their occupation or of lands which may be hereafter by legal process reclaimed for them from the grant lands on which they are now living, be patented to the several bands occupying them; the United States to hold the patent in trust for the period of twenty-five years; at the expiration of that time the United States to convey the same by patent to said Indians, as has been done for the Omaha Indians. * * *."

Excerpts from the accompanying legal opinion:

"* * * Before and at the date of the treaty of Guadalupe Hidalgo, all the territory now known as California was a part of and under the jurisdiction of the Mexican Republic. * * *

\* \* \* \* \*

"The Mexican Government reserved from private grant all lands occupied and possessed by the Indians. Great care was taken to make strict reservation of such land, and by law no valid grant of land occupied or possessed by Indians could be made so as to dispossess them. When

California was ceded to the United States the rights of property of its citizens remained unchanged. * * *

\* \* \* \* \* \*

"By the fundamental laws of 1824, the regulation of 1828, and the regulation of the departmental legislature, one condition was that in making private grants of lands the lands granted must be vacant lands. Lands occupied by and in possession of Indians were not such vacant lands, for by the same laws and regulations it was provided that such grants must be without prejudice or damage to the Indians, and that such land granted to the damage and injury of the Indians should be returned to the rightful owners. * * *

\* \* \* \* \* \*

"The Indians and their descendants, who occupied and now occupy lands within the grants above named, as well as grants containing claims of a similar character, are in our opinion possessed and seized of the lands which were and have been and now are in their possession, and they can hold the same against persons claiming the same by virtue of a United States patent, issued upon a confirmed Mexican grant."

It appears from the history of the act and the language used therein that Congress intended these lands to be acquired and set apart for these Indians. The wording further discloses that in dealing with the fee of these lands it was the purpose from the very enactment of the statute ultimately to invest a title in those qualified Indians in severalty for their sole and exclusive ownership and management. It was considered wise to withhold the vesting of the absolute fee from them for a while, but the plan was that ultimately the patent would issue for the allotment which would convey complete title. Thus, Congress was dealing with the fee, and it was an interest in the fee which the selection of an allotment by a qualified Indian secured. This being the case such initiation of a selection vested in the Indian an equitable right of which he could not be deprived by the Secretary of the Interior withholding approval without legal cause.

In the enactment of the Mission Indian Act the Congress intended that when an allotment was selected by, and scheduled to, a qualified Indian, under the supervision of the Secretary of the Interior through the properly designated allotting officer, that there was thereby vested an equitable interest in the allottee of which

he could not be despoiled by the failure of the Secretary of the Interior to comply with the directions of the statute. The courts have so held. The selection of and the filing upon an allotment is the inception of title. Hooks v. Kennard, 28 Okl. 457, 463, 114 P. 744, 746; Reynolds v. Brooks, 49 Okl. 188, 195, 152 P. 411, 413.

As used in an act for the allotment of land to Indians in severalty, the word "'allot' is not a term of sale or grant, but of apportionment of that to which the parties are entitled as of right." Parr v. United States, 153 F. 462, 468. The selection of the allotment and the issuance of the certificate therefor constituted the inception of a vested equitable interest.

"The right to the allotment already existed, and the United States, by the allotment or certificate, merely set aside to the Indian the land that was rightfully his, after he had made his selection." Millet v. Bilby, 110 Okl. 241, 237 P. 859, 862.

The allotment certificate and the designation of it in the schedule and map by the allotting officer was evidence that the selection was made by a duly qualified member of the tribe. The allottee did all that was required of her to entitle her to an allotment; there is no claim that she is not qualified to take an allotment under the Mission Indian Act. The fact that the Secretary has not formally approved the allotment and refuses to issue a patent in no way affects her equitable interest in the land selected. Thomason v. Wellman & Rhoades, 8 Cir., 206 F. 895.

When a selection has been made and the right of allotment has attached, delay in issuing, or failure to issue the patent, does not postpone or defeat the vesting of the equitable interest in the allottee. The right depends not upon what was not done but upon what ought to have been done. A selection made at a time when the right exists to do so creates an interest or right so vested that it descends to the heirs and fixes the right of property. Smith v. Bonifer, C.C., 132 F. 889, 891.

In Bonifer v. Smith, 9 Cir., 166 F. 846, 849 (affirming 9 Cir., 154 F. 883; cases involve Umatilla Indian allotments), this court said:

"In Lytle et al. v. State of Arkansas et al., 9 How. 314, 13 L.Ed. 153, the court said:

"'It is a well-established principle that where an individual, in the prosecution of a right, does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect it.'

"This was said in a case in which a pre-emption right to government land was asserted, and the pre-emptor had done all that the law required him to do, but the land officers awarded the land to another. Several years thereafter the court, by a decree, awarded the land to the heirs of the original claimant. The doctrine of that case was affirmed in the Yosemite Valley Case, 15 Wall. 77, 21 L.Ed. 82. Considering, therefore, the rights of the parties as if the allotment had· been allowed when the selections were made, there can be no question that upon such allotments the allottees acquired an estate of inheritance. This court has so held in the case of Beam v. United States et al., [9 Cir.] 162 Fed. 260."

See Barney v. Dolph, 97 U.S. 652, 24 L.Ed. 1063; Cornelius v. Kessel, 128 U.S. 456, 9 S.Ct. 122, 32 L.Ed. 482; Ballinger v. United States ex rel. Frost, 216 U.S. 240, 30 S.Ct. 338, 54 L.Ed. 464; United States v. Payne, 9 Cir., 284 F. 827; Payne v. Mexico, 255 U.S. 367, 41 S.Ct. 333, 65 L.Ed. 680.

In the case of Supervisors of Rock Island County v. United States ex rel. State Bank, 4 Wall. 435, 71 U.S. 435, 18 L.Ed. 419, the important question was whether the Supervisors were compelled to levy and collect, by taxation, an amount specified in the order of the court below. The court considered only the one act which declared that "the board of supervisors under township organization, in such counties as may be owing debts which their current revenue, under existing laws, is not sufficient .to pay, may, if deemed advisable, levy a special tax, not to exceed in any one year one per cent. upon the taxable property of any such county." 4 Wall. on page 446, 18 L.Ed. 419, the court said: "The conclusion to be deduced from the authorities is, that where power is given to public officers, in the language of the act before us, or in equivalent language—whenever the public interest or individual rights call for its exercise—the language used, though permissive in form, is in fact peremptory. What they are empowered to do for a third person the law requires shall be done. The power is given, not for their benefit, but for his."

The fact that the Secretary of the Interior, conforming to Section 4 of the Mis-

sion Indian Act, directed Agent Wadsworth to make these allotments first in 1923 and again in 1927 is sufficient to establish, in the absence of any evidence to the contrary, that in his opinion these Indian allottees were so advanced "in civilization as to be capable of owning and managing land in severalty."

The determination of this essential, the selection of the different tracts, the surveying of the lands, the scheduling of them as allotments, and the certifying of them to the allottee and to the Department were equivalent to the approval contemplated by the law. In any event, the appellants thereby acquired a vested interest in the lands allotted, of which they could not be deprived by the refusal of the Secretary to act. After issuance of the allotment certificate to a qualified Indian a patent as a mere formal evidence of title was but a ministerial act, performance of which will be compelled. See United States v. Stone, 2 Wall. 525, 17 L.Ed. 765.

As was said by the Supreme Court in Ballinger v. United States ex rel. Frost, 216 U.S. 240, 30 S.Ct. 338, 341, 54 L.Ed. 464, "Thereafter the Secretary of the Interior had nothing but the ministerial duty of seeing that a patent was duly executed and delivered."

The qualification of these Indians and their ordinary right to receive allotments in these lands long occupied and possessed by their ancestors are not disputed.

The objections to the issuance of these patents are represented as coming from some of the other Mission Indians who, having declined allotments apportioned to them and having refused the opportunity to make selections for themselves, seem now to have been made aware of a potential increase in the value that these tracts would have. And at this late day it is sought to have all prior proceedings as to these allotments set aside and the lands sold.

In a letter to the Commissioner of Indian Affairs, Special Agent Wadsworth stated that some of these objecting Indians at Palm Springs, for years before the allotments were made, were in control of the hot springs at that place and the revenue derived from them; others of them had appropriated much valuable land there in excess of their proportionate share; these were the objectors to allotment. He further stated: "The fact that allotments already made there have been slow in receiving departmental approval lends color to their contention that they have succeeded in effectually blocking the plan for allotments."

From the hearings before the Senate Committee it would appear that this group of objectors are being incited and abetted by speculators in real estate ventures, and particularly by the opulent contingent who spend their leisure at this famed resort and whose exquisite sensibilities are emotionally disturbed by the proximity of the shabby habitats of these native Indians.

In Ballinger v. United States ex rel. Frost, supra, 216 U.S. 240, 249, 30 S.Ct. 338, 340, 54 L.Ed. 464, where the facts were similar to those in the instant case, it was contended that the supervisory power of the Secretary of the Interior continues until ultimate, final action, whereby the title passes—i. e., until his approval of the patent and authorization of its delivery. That the Secretary never authorized the allotment of this tract and that the allotment certificate did not pass title are points which were also argued. But the court in the course of its opinion had this to say: "Whenever, in pursuance of the legislation of Congress, rights have become vested, it becomes the duty of the courts to see that those rights are not disturbed by any action of an executive officer, even the Secretary of the Interior, the head of a department. However laudable may be the motives of the Secretary, he, as all others, is bound by the provisions of congressional legislation. It must be borne in mind that this allotment provided by Congress contemplated a distribution among the Choctaw and Chickasaw Indians of the lands that belonged to them in common. They were the principal beneficiaries, and their titles to the lands they selected should be protected against the efforts of outsiders to secure them. White men settling on town sites were not the principal beneficiaries. * * *"

Even where the law provides that an allotment selection is to be subject to the approval of the Secretary of the Interior before the issuance of a patent therefor, there was by no means an intention to invest him with the arbitrary power of withholding approval on a mere whim. There must be a legal cause to justify his failure to act.

If the Secretary could thus, upon his own capricious judgment, decide that lands authorized to be allotted by Congress ought

not to be allotted and would refuse without legal cause to approve these allotments when submitted for action, he could practically nullify the law by withholding the very lands from allotment which Congress had authorized to be so distributed. The Act of February 6, 1901, c. 217, 31 Stat. 760, 25 U.S.C.A. § 345, was enacted to correct such an abuse of power, and the last sentence of the majority opinion is meaningless.

Decision should be for appellants.

Concurring: I concur in the holding of the majority denying the motion to dismiss these appeals.